617 A.2d 1163

**MONUMENTAL LIFE INSURANCE COMPANY**

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY, et al.**

No. 433, Sept. Term, 1992.

Court of Special Appeals of Maryland.

Jan. 8, 1993.

506

John Amato, IV (Goodman, Meagher & Enoch, on the brief), Baltimore, for appellant.

James M. Brault (Albert D. Brault and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellee, Reliance.

Jonathan L. Abram (Karen M. Hardwick and Hogan & Hartson, on the brief), DC, for appellee, California.

(John R. Pennallegon, David J. McManus and Smith, Somerville & Case, on the brief), Baltimore, for appellee, USF & G.

(Gary C. Duvall and Miles & Stockbridge, on the brief), Towson, for appellee, U.S. Fire Inc.

Argued before WILNER, C.J., and ALPERT and ROSALYN B. BELL, JJ.

**508**

ALPERT, Judge.

In this case, Monumental Life Insurance Company, appellant, brought a declaratory action against four other insurance companies (the appellees herein) alleging that the various appellees were obligated to indemnify Monumental for costs and fees it had incurred while litigating a certain claim with a third party. In granting summary judgment for the appellees, the lower court denied all coverage to Monumental. Monumental now appeals, asking us to address ten issues related to its various policies. We shall affirm.

## BACKGROUND

At its heart, this case is simply about indemnification: Monumental Life Insurance Company ("Monumental") contends that any or all of the four appellees herein, all of which are other insurance companies [1], are obligated to indemnify Monumental for costs and fees it incurred while litigating a prior claim with a third party, Peoples Security Life Insurance Company ("Peoples"). The facts that gave rise to *both* (1) the present litigation (*Monumental v. USF & G et al*) *and* (2) the underlying "third party" litigation (*Peoples v. Monumental*) may be summarized as follows:

A. *The Underlying Litigation: Peoples v. Monumental*

Peoples and Monumental are both large, competing "home-service" life insurance companies which sell their various life insurance policies through individual agents; the agents, in turn, call on their customers at their homes and businesses.

In September, 1982, Monumental hired as an Executive

---

1. The four appellees herein are (1) United States Fidelity and Guaranty Company ("USF & G"), (2) United States Fire Insurance Company ("US Fire"), (3) Reliance Insurance Company ("Reliance"), and (4) California Union Insurance Company ("Cal Union").

Vice President B. Larry Jenkins [2]. Larry Jenkins had been previously employed as the President and Chief Executive Officer ("CEO") of Peoples. Approximately one month later, Monumental hired as an Agency Vice President Ronald J. Brittingham. Brittingham had been previously employed as a field Vice President at Peoples. In June, 1983, Monumental hired a third officer from Peoples, Willard (Gene) Hines, who left Peoples to become a consultant with Monumental.

These, as well as numerous other alleged departures of Peoples' employees to Monumental, began to concern Peoples [3]. A series of letters and conversations between the two companies ensued. Included among these was a letter dated November 30, 1983, from William P. Gregg (President, Capital Holding Corporation [4]) to Leslie B. Disharoon (Chairman, Monumental). This letter contained the following language:

> This will confirm the substance of Tom Simons' [Chairman and CEO of Capital Holding Corporation] conversation with you [Disharoon], in which he indicated that we have observed a substantial effort on the part of Monumental to induce Peoples' employees to terminate their employment and join Monumental. Based upon those observations, we have conducted a more thorough investigation of those activities. That investigation has exposed substantial evidence of an extensive campaign by Monumental to hire Peoples' employees. This evidence includes the fact that Monumental has hired approximately 25 Peoples' employees in the last five months.
>
> In addition to the dramatic volume of that activity, the investigation also revealed a startling number of wrong-

---

2. By spring, 1983, Larry Jenkins would become Monumental's President, Chairman of the Board and CEO.

3. Peoples eventually contended that, during this approximate time period, Monumental solicited and hired 105 Peoples' agents and managers, and rewrote over 1,400 of Peoples' policies.

4. Capital Holding Corporation is the parent corporation of Peoples.

ful actions, including the use by some of your employees of confidential information that was obtained during their tenure as Peoples' employees, and the misrepresentation of information allegedly obtained by such Monumental employees during their employment by Peoples.

We believe that those activities are unethical. In addition, we are advised that they provide grounds for litigation against Monumental and the individual employees involved. As you can well imagine, we cannot allow them to continue.

Accordingly, we are making this final effort to resolve this problem without formal action. However, if we receive any further evidence that your employees are persisting in their pirating of Peoples' employees, I will instruct counsel to commence litigation and will also consider filing charges of unethical conduct against the appropriate parties under the auspices of industry trade associations. I deeply hope that such action will not be required, but recognize that swift, decisive action on your part will be required to avoid it. * * * *

In addition, pursuant to a letter dated December 16, 1983, from Larry Jenkins (then Chairman and CEO of Monumental) to Thomas Simons (Chairman and CEO of Capital Holding Corporation, as aforementioned), Monumental indicated as follows:

At your request, we are willing to come to a mutual understanding concerning our field personnel hiring practices and yours. * * * * As we discussed by phone, our proposal is this: [wherein Jenkins stated four proposed terms]. * * * *

In making this proposal, we expressly deny all accusations which have been made about improper acts on our part with respect to Peoples or its field personnel. We have not engaged in any unfair competition. The understanding reached above includes any future work of Gene Hines and any other people we may use.

With this settlement reached between us, we understand there will be no need for litigation between Monumental and Peoples on the matter.

If I have correctly expressed our understanding, please acknowledge.

As a result of, *inter alia,* the above letters and conversations, Monumental and Peoples, by letter dated January 17, 1984, agreed to a five-month hiring moratorium.

After this moratorium ended, Monumental hired as a Regional Sales Vice President Thomas Jenkins, a fourth Peoples' officer. As a result, after further discussion and amid threats of litigation, the parties negotiated a second, more complete agreement that was memorialized by a letter dated September 13, 1984. By this letter agreement (and subject to a few delineated exceptions), the parties reciprocally agreed, *inter alia,* (1) to a one-year moratorium on the hiring of each other's employees, (2) to a three-year moratorium on the recruiting of each other's employees, (3) not to use any of the other's proprietary information, nor to make any material misrepresentations about the other, and (4) to release mutually each other from claims resulting from conduct that occurred before September 13, 1984. (This September 13, 1984 letter agreement shall hereinafter be referred to as the "Agreement.") The Agreement also provided for a dispute-resolution procedure culminating in binding arbitration.

Despite this Agreement, Monumental allegedly continued to recruit officers and agents from Peoples. Indeed, from 1983 through 1986, inclusive, Monumental was alleged to have hired 61 of Peoples' managers and 222 of its agents, and to have rewritten approximately 10,000 of its policies. Additionally, Monumental was alleged to have told Peoples' policyholders, *inter alia,* that (1) Peoples was "going broke," and (2) Peoples could not afford to pay claims, or cash surrender values, on its policies.

On August 1, 1986, Peoples filed in the United States District Court for the Middle District of North Carolina, an

eleven count complaint against Monumental, Larry Jenkins, Brittingham and Thomas Jenkins. The following sets forth the relief sought by Peoples:

*Count 1* sought rescission of the parties' Agreement based on fraudulent inducement;

*Counts 2 through 4,* inclusive, alleged breaches of fiduciary duty by the respective, individually named defendants;

*Count 5* sought recovery for unlawful appropriation of trade secrets and confidential information;

*Counts 6 and 7,* respectively, sought recovery for tortious interference with contract, and tortious interference with business relationships;

*Count 8* sought recovery for unfair or deceptive trade practices;

*Count 9* sought recovery for unjust enrichment;

*Count 10* sought recovery for a civil RICO violation; and,

*Count 11* sought recovery for defamation [5].

On March 20, 1987, on motion filed by Monumental, Peoples' suit was transferred to the United States District Court for the District of Maryland. Shortly thereafter, on April 23, 1987, Peoples filed an Amended Complaint which (1) added Hines as an additional defendant, (2) added, as a new Count 5, a breach of fiduciary duty against him,

---

**5.** In this eleventh count Peoples contended, *inter alia,* that "[o]n numerous occasions the agents of [Monumental] made defamatory comments to the policyholders of [Peoples] including, but not limited to:

"(a) That [Peoples] was going out of business.

"(b) That [Peoples] was having financial problems and would not be able to pay its claims.

"(c) That [Peoples'] policyholders were going to lose the money that they had paid to [Peoples] and would soon be unable to get their cash surrender value out of their policies from [Peoples].

"(d) That the agents of the [Monumental] still worked for [Peoples], but that [Peoples] had changed its name to Monumental Life Insurance Company."

individually, and (3) added some supplemental factual allegations.

Monumental then moved, pursuant to the parties' Agreement, to have the parties' claims submitted to binding arbitration. Peoples resisted that effort, contending that the Agreement itself was null and void for having been fraudulently induced. The United States District Court for the District of Maryland (Joseph Howard, J.) denied Monumental's motion (and therefore set the case in for trial), after which Monumental filed an interlocutory appeal to the United States Court of Appeals for the Fourth Circuit. On appeal, the circuit court, by opinion dated February 10, 1989, reversed the district court's ruling and determined that, indeed, Peoples' *entire* claim (including the issue as to fraudulent inducement) was subject to binding arbitration [6].

On March 15, 1989, Peoples filed its ten count "Demand for Arbitration." Peoples' Demand contained essentially the same contentions as had their federal court complaint *except* that the Demand (1) did *not* contain the individual tort count of defamation, and (2) *added* one new claim for relief. Peoples captioned this new claim "Alternative Claim for Breach of Contract," and alleged therein, *inter alia,* that "Monumental Life failed to comply with the spirit of the [parties' September 13, 1984] Agreement."

After bifurcating liability issues from damage issues, the arbitration panel heard evidence intermittently from February 20 through April 9, 1990, before issuing its written decision regarding liability on August 29, 1990. The panel determined that, with respect to the parties' September 13, 1984 Agreement, Monumental was *not* liable for fraud in the inducement because the transaction was entered into at arms length and, as a result, pursuant to the Agreement's mutual release provision, Monumental was released from

---

**6.** *See Peoples Security Life Ins. v. Monumental Life Ins.,* 867 F.2d 809 (4th Cir.1989).

any claims based on conduct prior to September 13, 1984. The appellees adequately summarized various other findings of the arbitration panel:

1. Paragraph 2 of the Agreement prohibited Monumental from hiring employees of Peoples for a period of one year. The arbitrators found that *Monumental breached this provision* because during the one-year period it opened employment negotiations with three Peoples' employees who were later hired by Monumental.

2. Paragraph 3 of the Agreement prohibited Monumental from recruiting Peoples' employees for a period of three years. The arbitrators found that *Monumental breached this provision* through recruiting activities by many Monumental employees in Baton Rouge, LA, Hagerstown, MD, and Newport News, VA.

3. Paragraph 4 of the Agreement prohibited Monumental from using certain proprietary information of Peoples, including a variety of material listed in the Agreement. The arbitrators found that *Monumental breached this provision* by using customer lists and other Peoples' proprietary information in competing for business.

4. The arbitrators read into the Agreement the usual duty of good faith and fair dealing implied in every contract. They also found that Monumental undertook additional obligations in Paragraph 6 of the Agreement, which required "full compliance with the spirit and the terms of this Agreement." The arbitration panel [7] "interpret[ed] paragraph 6 of the Agreement as an implied contractual commitment not to engage in the tort of unfair competition regarding the subject matter of the Agreement." Having found

---

7. The arbitration panel is sometimes referred to herein as the "Tribunal."

that contractual obligation, the arbitrators found that *Monumental breached it.*

(Footnote and emphasis added.)

In addition to the above findings, the panel's written decision also contained a section captioned "Other Tort Claims." In this section, the panel found as follows:

In addition to unfair competition, [Peoples] asserts tort claims for, among other things, misappropriation of trade secrets and confidential information, tortious interference with contracts and business relationships, employee piracy, and deceptive practices. The factual basis for all of these tort claims is essentially the same.

The Tribunal, having found the tort of unfair competition, finds it unnecessary to reach the other tort claims raised by [Peoples].

Following a separate hearing on damages, the panel, by order dated September 11, 1991, awarded Peoples the sum of $9,424,651.00. With respect to the defense of the action brought by Peoples, Monumental alleges that it incurred over $2,000,000.00 in defense costs.

### B. *Monumental's Insurance Coverage*

With respect to the case *sub judice,* Monumental claims that the various appellees have an obligation to defend and/or indemnify Monumental for any damages and costs it incurred in its litigation with Peoples. The appellees have refused to do either (*i.e.,* defend or indemnify). Monumental now contends that, with respect to the duty to defend, all policies of all appellees (except Cal Union) included such a provision. The Cal Union policy is a "duty to pay" defense costs policy, rather than a "duty to defend" type. Monumental has summarized its insurance coverage as follows:

From 1982 through 1986, inclusive, Monumental had purchased comprehensive general liability insurance ("CGL") and umbrella excess insurance ("Excess") from three of the appellees herein, USF & G, Reliance and US Fire. During that time period, Monumental also purchased director and

officer liability insurance ("D & O") from the fourth appellee herein, Cal Union. The following chart summarizes these various coverages [8].

| | 1982–83 | 1983–84 | 1984–85 | 1985–86 |
|---|---|---|---|---|
| Primary Liability Coverage | USF & G | Reliance | Reliance | Reliance |
| Limit | $500,000 | $500,000 | $500,000 | $500,000 |
| First Excess Umbrella Layer | USF & G | Reliance | US Fire | US Fire |
| Limit | $ 1 0 M excess of $500,000 | $ 2 0 M excess of $500,000 | $ 2 0 M excess of $500,000 | $ 1 5 M excess of $500,000 |
| Director & Officer Liability | Cal Union | Cal Union | Cal Union | Cal Union |
| Limit | $20M | $20M | $20M | $20M |

## C. *The Present Litigation*

On February 7, 1990, Monumental filed this declaratory action in the Circuit Court for Baltimore City, against appellees USF & G, Reliance, US Fire, and Cal Union (hereinafter collectively referred to as "the carriers")[9]. Monumental's complaint, *inter alia,* sought a declaratory judgment that the carriers were obligated to defend and indemnify Monumental (and certain of its officers) for costs and fees associated with defending the suit brought against it by Peoples. In its complaint, Monumental contended that this duty to defend and/or indemnify emanated from (1) either personal injury coverage or advertising injury cover-

---

**8.** In the chart which follows, the letter "M" is used to abbreviate the word "million." Moreover, all dates specified are only approximate; specific dates of coverage are set forth elsewhere in this opinion.

**9.** Note that the case at bar was filed while the underlying litigation (*i.e., Peoples v. Monumental*) was still pending.

age under both the USF & G and Reliance policies, (2) advertising injury coverage under the US Fire policy, and (3) D & O coverage under the Cal Union policy[10].

On March 14, 1990, the carriers successfully removed the case to the United States District Court for the District of Maryland. Following the removal, the parties filed cross-motions for summary judgment. By Memorandum Opinion dated June 6, 1991, the court (William M. Nickerson, J.) (1) *denied* Monumental's motion for summary judgment, and (2) *granted* the carriers' motions for summary judgment. Subsequently, in a Memorandum Opinion and accompanying Order dated August 14, 1991, the court (1) *denied* Monumental's Motion to Vacate Judgment and to Remand, and (2) *granted* various Motions to Alter or Amend the Judgment that had been filed by both Monumental and the carriers. The ultimate effect of the District Court's judgment was to deny all coverage to Monumental.

Monumental subsequently noted a timely appeal to the United States Court of Appeals for the Fourth Circuit, which, on October 9, 1991, vacated the federal district court's judgment for lack of subject matter jurisdiction (incomplete diversity). The case was correspondingly remanded to where it began, the Circuit Court for Baltimore City.

By stipulation of all of the parties, all of the pleadings, motions and memoranda filed while the case was pending before the United States District Court were deemed filed and operative in that Maryland state court; in addition, following remand, the parties filed supplemental memoranda for the state court to consider. After a February 4, 1992 hearing, the circuit court (Joseph H.H. Kaplan, J.) "regranted" the carriers' Motions for Summary Judgment, and adopted as its reasons those set forth in the two federal Memoranda Decisions (dated June 6, 1991, and August 14,

---

**10.** Monumental alternatively argued that there was drop-down or "first dollar" coverage afforded under the Excess policies if certain exclusions or lack of coverage existed in the CGL policies.

1991, respectively) [11]. Monumental accurately summarized those reasons as follows:

I. *USF & G*

 A. *CGL POLICY*

 1. PERSONAL INJURY COVERAGE

 a. Peoples' defamation claim was barred by statute of limitations.

 b. Exclusion (4) precludes coverage of defamatory statements made with "knowledge of falsity."

 2. ADVERTISING INJURY COVERAGE

 a. Monumental's conduct was not "advertising activity," but only "solicitation."

 b. Exclusion (7) precludes coverage if done with "actual malice."

 B. *EXCESS POLICY*

 1. PERSONAL INJURY COVERAGE

 a. Same as I.A.1.a, *supra* (limitations).

 2. ADVERTISING INJURY COVERAGE

 a. Monumental's conduct was not an "advertisement, publicity article, broadcast or telecast."

II. *RELIANCE*

 A. *CGL POLICY*

 1. PERSONAL INJURY COVERAGE

 a. Exclusion 2(b) precludes coverage if first publication occurred prior to effective date.

 b. Exclusion 2(c) applicable; same as I.A.1.b., *supra* (knowledge of falsity).

 c. No "occurrence," meaning no accidental nor unexpected nor unintended injury.

 2. ADVERTISING INJURY COVERAGE

---

**11.** Consequently, any mention herein of the "lower court's findings" necessarily includes findings of the U.S. District Court as such were incorporated by reference into the Baltimore City Circuit Court's opinion.

a. Same as I.A.2.a., *supra* (not "advertising activity").

B. *EXCESS POLICY*

 1. PERSONAL INJURY COVERAGE

 a. Same as II.A.1.c., *supra* (no "occurrence").

 2. ADVERTISING INJURY COVERAGE

 a. Same as I.A.2.a. *and* I.B.2.a., both *supra* (neither advertising activity, nor an advertisement, publicity article, broadcast or telecast).

III. *US FIRE: EXCESS POLICY:* ADVERTISING INJURY COVERAGE

 A. Same as I.B.2.a., *supra* (no advertisement, publicity article, broadcast or telecast).

 B. No occurrence during policy period.

IV. *CAL UNION: D & O POLICY*

 A. Policy void for material misrepresentation.

 B. The individual officers of Monumental are not "legally obligated to pay."

Accordingly, on February 7, 1992, the Circuit Court for Baltimore City entered summary judgment in favor of the carriers [12]; from this judgment, Monumental filed this timely appeal, in which it asks us to resolve the following ten questions:

1) Did the circuit court err when it held that Monumental's claims were not covered by the *personal injury* coverage of the USF & G and RELIANCE policies?

2) Did the circuit court err when it held that Monumental's claims were not covered by the *advertising injury* coverage of the USF & G, RELIANCE and US FIRE policies?

3) Did the circuit court err when it denied advertising liability coverage as against USF & G for the *commer-*

---

**12.** The trial court also granted summary judgment in favor of USF & G and Cal Union, and as against Monumental, on counterclaims filed by USF & G and Cal Union in which those two companies successfully sought restitution from Monumental of various "conditional" payments made toward Monumental's defense costs.

*cial disparagement* alleged against Monumental, by applying the wrong statute of limitations?

4) Did the circuit court err when it denied coverage [as against USF & G and RELIANCE] on the basis of allegations that Monumental *knowingly published false statements* about Peoples, or *acted with malice* toward Peoples, contrary to findings in the underlying litigation?

5) Did the circuit court err when it denied coverage on the basis that no *"occurrences"* took place as defined under the RELIANCE policies?

6) Did the court err when it refused to consider *admissions* made by agents of USF & G, RELIANCE and US FIRE that their respective policies provided coverage herein?

7) Did the circuit court err when it denied coverage as against RELIANCE on the basis that the alleged *defamatory statements* first occurred *prior to the effective date* of the policy?

8) Did the court err when it held that CAL UNION'S D & O policy was void *ab initio* on the basis that Monumental *materially misrepresented* its response to an application question that it was not aware of any facts which might result in a claim which would fall within the proposed insurance, and did the court err when it held that CAL UNION'S attempted *rescission*, 4 years after the Peoples' suit was commenced, was timely?

9) Did the court err when it held that CAL UNION'S D & O policy, even assuming that it was not void *ab initio*, did not provide coverage in any event because the officers and directors were *not individually liable*, even though judgment was entered against them?

10) Did the court err when it ordered Monumental to return $232,206.97 and $225,717.43 paid by USF & G and CAL UNION, respectively, to Monumental for defense costs as having been *"conditional" payments?*

We restate the above ten questions as four succinct issues:

I. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G, RELIANCE AND US FIRE ON MONUMENTAL'S CLAIM FOR *ADVERTISING INJURY* COVERAGE? [13]

II. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G AND RELIANCE ON MONUMENTAL'S CLAIM FOR *PERSONAL INJURY* COVERAGE? [14]

III. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR CAL UNION ON MONUMENTAL'S OFFICERS' CLAIM FOR *D & O* COVERAGE UNDER A VALIDLY RESCINDED POLICY? [15]

IV. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G AND CAL UNION ON THEIR COUNTERCLAIMS WHICH SOUGHT *RESTITUTION OF CONDITIONAL PAYMENTS* TOWARDS DEFENSE COSTS? [16]

We shall discuss these four issues respectively.[17]

## STANDARD OF REVIEW

Monumental's insurance liability policies with the various appellees may be summarized briefly: with respect to both USF & G and Reliance, there were two separate policies under which Monumental was insured—a *CGL* policy and an *Excess* policy. Under *each* of those two policies, there

---

**13.** Therefore Issue I is meant to address concerns raised by appellant's Questions (2) and (4), above.

**14.** Therefore Issue II is meant to address concerns raised by appellant's Questions (1), (3), (5) and (7) above.

**15.** Therefore Issue III is meant to address concerns raised by appellant's Questions (8) and (9), above.

**16.** Therefore Issue IV is meant to address concerns raised by appellant's Question (10), above.

**17.** In addition to the four issues set forth above, we will discuss concerns raised by appellant's Question (6) in Part V of this opinion.

were two distinct types of coverages—personal injury and advertising injury. With respect to appellee US Fire, there was *only* an excess policy and *only* advertising injury coverage. Finally, with respect to Cal Union, there was *only* a D & O policy.

The lower court determined that neither USF & G nor Reliance was liable to Monumental under *either* type of coverage under *either* policy; in all instances, the lower court supported its findings with one or more independent grounds. Additionally, the court determined that US Fire was not liable based on two alternative independent grounds. With respect to Cal Union, the court found no coverage under the D & O policy based on two alternative independent grounds. In summary, the lower court denied all coverage to Monumental.

We are now asked to review the propriety of the lower court's granting of the various motions for summary judgment. The facts set forth above in the *Background* section of this opinion are not in dispute. There are, however, other facts (discussed below) that Monumental implicitly claims *are* in dispute.[18]

In Maryland, the moving party is entitled to summary judgment only when there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. Md. Rule 2–501; *see, e.g., King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). Moreover, as we noted in *DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 527 A.2d 1316 (1987), "In ruling on a motion for summary judgment, all disputed facts and inferences therefrom should be viewed in the light most favorable to the party

---

**18.** In a *footnote* in its brief, Monumental suggests that there was no basis upon which the lower court could have granted summary judgment in favor of the carriers when the court "simply relied on the dictionary definition of the term 'advertising'" to reach its decision. Although we would have expected that Monumental would have made this argument first and foremost in its brief, its other arguments presented throughout its brief implicitly suggest that there are several material disputed facts in this case, and summary judgment was therefore improper.

against whom the motion is made." *Id.* at 160, 527 A.2d 1316. We must therefore now determine whether, in any of the claims in the case at bar, after viewing all of the facts and inferences therefrom in a light most favorable to Monumental, there is any dispute as to any material fact and, if not, whether the various appellees were entitled to judgment as a matter of law.

■ In addition, where the lower court relied on several alternative independent grounds in reaching its decision, we must determine that at least *one* of those independent grounds was properly decided in order to affirm that decision. *Ellett v. Giant Food, Inc.,* 66 Md.App. 695, 700, 505 A.2d 888 (1986). In other words, in order for us to disturb the lower court's granting of summary judgment as to the denial of a specific coverage under a particular policy, we would have to determine that *all* of the grounds upon which the court relied were improper.

## I. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G, RELIANCE AND US FIRE ON MONUMENTAL'S CLAIM FOR *ADVERTISING INJURY* COVERAGE?

The lower court granted summary judgment in favor of three appellees (USF & G, Reliance and US Fire [19]), and against Monumental, on the issue of advertising injury coverage. Monumental now asserts that the lower court erred in granting summary judgment to the carriers, because Monumental alleges that its conduct occurred in the course of its "advertising activities," and therefore coverage should have been provided.

### A. *THE CGL POLICIES:* USF & G AND RELIANCE— SCOPE OF "ADVERTISING ACTIVITIES"

Both of the CGL carriers—USF & G and Reliance— essentially make the same arguments regarding the scope

---

**19.** US Fire is only an *Excess* policy carrier, whereas USF & G and Reliance provided *both CGL and Excess* coverage at some point during the relevant period in this case (*i.e.,* October 12, 1983 through December 1, 1986).

of the term "advertising injury coverage" contained in their respective (but similarly worded) CGL policies. Therefore, we will combine our discussion of their arguments supporting the denial of advertising injury coverage.

USF & G's CGL policy defined "advertising injury" as injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, unfair competition....

Reliance's CGL policy defined "advertising injury" as injury sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the Named Insured's business: libel, slander, defamation, invasion of the right of privacy, piracy, unfair competition or idea misappropriation under an implied contract ... arising out of the Named Insured's advertising activities[.]

\* \* \* \* \* \*

In denying coverage under USF & G's advertising injury policy, the trial court held that existing legal principles combined with the facts alleged in Peoples' complaint required the conclusion that Monumental's alleged conduct did *not* occur "in the course of Monumental's 'advertising activities.'" The court relied on four interrelated factors for its decision.

First, the trial court referred to the canons of construction observed in Maryland that require the policy to be measured "by its express terms and provisions," and to give the terms "their customary and normal meaning." The lower court stated that although Maryland law requires that claims must be only *potentially* covered by the policy, *Brohawn v. Transamerica Ins.*, 276 Md. 396, 347 A.2d 842 (1975), it found that the customary and normal usage of "advertising activity" did *not* include sales or solicitation as alleged by Peoples in the underlying case.

Second, the lower court relied on *Grosman v. Real Estate Comm'n*, 267 Md. 259, 297 A.2d 257 (1972), for the proposition that advertising must be in the form of a *public announcement* (*i.e.*, calling public attention to one's product, service, need, etc.). The lower court held that there was no public announcement alleged in Peoples' complaints, but only private solicitations which, according to the court, are not encompassed by the term "advertising."

Third, the lower court favored the meaning of "advertising" adopted by the Court of Appeals for the Seventh Circuit in *Playboy Enterprises v. St. Paul Fire & Marine*, 769 F.2d 425 (7th Cir.1985); in *Playboy*, the Seventh Circuit held that advertising means the "widespread distribution of promotional material to the public at large." *Id.* at 428–29.

Finally, the lower court noted that the United States Circuit Court of Appeals for the Fourth Circuit, in *Liberty Life Ins. v. Commercial Union Ins.* ("Liberty I"), 857 F.2d 945, 950 (4th Cir.1988)—a case with substantially similar facts to the one at bar—left open the question whether solicitations by agents and for agents constitutes "advertising activities." In the case *sub judice*, however, the lower court found that the facts do *not* suggest that Monumental's agents' solicitations fell within Monumental's advertising activities, and therefore the lower court was not persuaded by the court's holding in *Liberty I.* The lower court concluded that all of the aforementioned factors demonstrate that "normal and customary usage" of "advertising activities" requires that it be of a *public* nature—which was not shown in the case at hand.

We agree for the following reason: the plain meaning of the term "advertising" to a reasonably prudent person is *not* susceptible of more than one meaning, and encompasses only the "public" sense of the word.

## ADVERTISING vs. SOLICITATION

■ Judges Nickerson and Kaplan, relying on Maryland law in the interpretation of insurance policies, held that a

reasonable layperson would not construe "advertising activities" in the context of the *CGL* policies to include the one-to-one sales activity of Monumental's agents.

The lower court clearly viewed advertising and solicitation as mutually exclusive, the difference being that advertising must be of a public nature. The court therefore found that Monumental's solicitations of Peoples' policyholders were not advertising because they were not of a "public nature." Judges Nickerson and Kaplan stated that "while 10,000 policies being replaced by Monumental may be widespread, it is neither 'public' nor 'advertising.' "

We agree.

As we have noted previously,

It is well settled that the construction of a written contract is ordinarily considered to be an issue of law for resolution by the trial judge. *University Nat'l Bank v. Wolfe,* 279 Md. 512, 369 A.2d 570 (1977); *Allen Engineering Corp. v. Lattimore,* 235 Md. 182, 201 A.2d 13 (1964). Only when there is a *bona fide* ambiguity in the contract's language or legitimate doubt as to its application under the circumstances is the contract submitted to the trier of the fact for interpretation. *See Board of Trustees v. Sherman,* 280 Md. 373, 373 A.2d 626 (1977); 4 *Williston on Contracts* § 616 (1961). Ambiguity arises if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language. *Truck Ins. Exch. v. Marks Rentals, Inc.,* 288 Md. 428, 418 A.2d 1187 (1980).

*Board of Educ. of Charles County v. Plymouth Rubber Co.,* 82 Md.App. 9, 26–27, 569 A.2d 1288 (1990).

In the present case, we agree with the lower court that there is no *bona fide* ambiguity in the language of the policies at issue, nor is there any legitimate doubt as to its application under the circumstances. "Advertising" means *advertising, i.e.,* "widespread distribution or announcements to the public." Consequently, Monumental's individ-

ual, one-to-one solicitations were clearly *not* "advertising" within the normal meaning of the word and, accordingly, the lower court acted properly.

## B. *THE EXCESS POLICIES:* USF & G, RELIANCE AND US FIRE—SCOPE OF "ADVERTISING ACTIVITIES"

The *Excess* policies of USF & G, Reliance, and US Fire are on a somewhat different footing than the *CGL* policies discussed above. The distinction is that each of the three *Excess* policies *expressly contained* companion language that *limited* advertising injury coverage to certain listed offenses committed in four specified types of publications: (1) an "advertisement," (2) a "publicity article," (3) a "broadcast" or (4) a "telecast." With respect to all three carriers, the lower court held that Monumental suffered no advertising injury as that term is defined in the carriers' respective *Excess* policies. The lower court stated that

> [t]here is no generalized term "advertising activities" within the definition of advertising injury in the Excess policy but only the language "advertisement, publicity article, broadcast or telecast."

In this regard, the lower court examined the case of *Liberty Life Ins. v. Commercial Union Ins.* ("Liberty II"), Case No. C/A 6:85–1352–17 (D.S.C. August 14, 1989) *aff'd*, No. 89–1799 & 89–1800 (4th Cir. February 14, 1991), a case which was cited by Monumental in its brief. *Liberty II* concerned a policy with the *same* language as the carriers' *Excess* policies in the case *sub judice,* and involved substantially identical facts. Having so considered *Liberty II,* the lower court in the case at bar proceeded to draw its decisive language therefrom:

> It is no where [sic] alleged in any of the underlying [Peoples'] complaints that any of the causes of action for which recovery is sought involved an offense 'committed in any advertisement, publicity article, broadcast or telecast'; nor has [Monumental] brought to this Court's attention any 'advertisement, publicity article, broadcast

or telecast['] which contains the arguable [sic] offensive language or activity being asserted as the basis of [Peoples'] claims.

(*Quoting Liberty II* at 24.)

The lower court held that Monumental's alleged solicitations did *not* constitute advertising activity and that none of the alleged activity (including the mailing of certain recruiting letters by Monumental) was done in any "advertisement, publicity article, broadcast or telecast" as defined in the carriers' *Excess* policies. We agree. Because this "companion language" *expressly* appeared in each of the carriers' *Excess* policies, we hold that coverage was *clearly* provided only for "advertising" in its general "public" sense. Consequently, because Monumental's "solicitations" at issue were admittedly *not* public in nature, neither USF & G, Reliance, nor US Fire had a duty to defend Monumental with regard to advertising injury under their respective *Excess* policies.[20]

## II. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G AND RELIANCE ON MONUMENTAL'S CLAIM FOR *PERSONAL INJURY* COVERAGE?

The lower court granted summary judgment in favor of USF & G and Reliance, and against Monumental, and in so doing denied Monumental personal injury coverage[21]. Monumental now asserts that, for the following three reasons, summary judgment should not have been granted against

---

**20.** In the event that we might have determined the threshold issue of "Whether Monumental's acts were considered 'advertising activities' under the carriers' *Excess* policies?" in Monumental's favor, each carrier (*i.e.*, USF & G, Reliance and US Fire) asserts supplemental arguments in support of their denial of advertising injury coverage under their respective *Excess* policies. Because we have determined that none of the respective carriers have any duty to defend Monumental under their *Excess* policies, we need not reach those supplemental arguments.

**21.** Monumental's policy with a third carrier, US Fire, did not contain coverage for personal injury.

it: (1) *with respect to USF & G only,* and contrary to the lower court's finding, the applicable statutes of limitations had not run on the Peoples' claims for which Monumental sought coverage, (2) *with respect to Reliance only,* and contrary to the lower court's finding, the alleged defamatory statements first occurred *during* (as opposed to *prior to*) the effective dates of the policy, and (3) *also with respect to Reliance only,* the lower court improperly determined that no "occurrences" took place which would trigger coverage. We discuss these contentions respectively below.

### A. USF & G only—Statutes of Limitations

With respect to USF & G only, the lower court found that the statute of limitations played a big part in allowing USF & G to properly deny personal injury coverage to Monumental. Specifically, with respect to Monumental's *CGL* policy with USF & G, Judges Nickerson and Kaplan determined that there were two independent reasons why USF & G could properly decline *personal injury* coverage to Monumental: (1) Peoples' underlying defamation claim was barred by the applicable statute of limitations, and (2) "Exclusion (4)" acts to preclude coverage to Monumental for defamatory statements made by Monumental with "knowledge of [the] falsity [of such statements]." Moreover, with respect to Monumental's *Excess* policy with USF & G, Judges Nickerson and Kaplan determined that USF & G could properly decline *personal injury* coverage to Monumental simply because the statute of limitations had run on Peoples' underlying defamation claim. In the relevant portion of its written opinion, the lower court held as follows:

> [Peoples' underlying] defamation claim was precluded by the statute of limitations as to USF & G at the time Peoples' filed its complaint. Peoples filed suit on August 1, 1986, and because defamation has a one year limitations, all such claims before August 1, 1985, were barred at the time the suit was filed because USF & G's policy expired December 1, 1983. Monumental failed to move to

dismiss defamation claims accruing before August 1, 1985. In light of these events, this Court agrees with USF & G that it should not have a duty to defend nor have damages imposed upon it for failure to defend the allegation of defamation. Another district court faced a similar situation and reasoned:

Given these facts ... [w]hile the court would not go so far as to impute to defendants an improper motive in their failure to take reasonable steps to obtain an expeditious dismissal of the obviously time-barred claims, in the court's view *it would be highly inequitable to require Southern Guaranty to pay for the defense of clearly non-insured claims* where the only potential for coverage arose long after institution of the lawsuit itself and *where any defense obligation was invoked and continued only by virtue of what were obviously time-barred tort claims which could have been with little time and effort, quickly disposed of.*

(*Quoting E.E.O.C. v. Southern Publishing,* 705 F.Supp. 1213, 1219–20 (S.D.Miss.1988); emphasis added by the lower court in the case *sub judice* ) (footnote omitted). Monumental now asserts that the lower court erred by finding that the statute of limitations precluded coverage on both the CGL and Excess policies.

The lower court held that Peoples' suit arose directly out of the Peoples/Monumental letter Agreement, dated September 13, 1984; therefore the applicable statute of limitations would begin to run shortly thereafter (*i.e.,* subject to the so-called "Discovery Rule," the statute would begin to run at the approximate point when Monumental breached the Agreement [22]). Monumental contends that the defamation-type claims in Peoples' underlying suit (which was filed on August 1, 1986) were based on two independent theories:

---

**22.** Under the discovery rule, a cause of action accrues at the time the plaintiff first knows or reasonably should have known of the alleged wrong. *See, e.g., Newell v. Richard,* 323 Md. 717, 723, 594 A.2d 1152 (1991). *See also Poffenberger v. Risser,* 290 Md. 631, 636, 431 A.2d 677 (1981).

(1) standard defamation, for which the statute of limitations is admittedly one year [23], and (2) violation of the North Carolina unfair and deceptive trade practices statute [24], for which the statute of limitations is four years. Therefore, (Monumental argues,) by the time Peoples filed its August 1, 1986 complaint, although the one-year statute of limitations *may* have run on Peoples' standard defamation claim, the *four-year* statute of limitations did *not* run on Peoples' *North Carolina unfair and deceptive trade practices claim* (and, consequently, USF & G's personal injury coverage should have been triggered). Monumental's arguments are unpersuasive.

■ Monumental's *CGL* policy with USF & G ran from October 12, 1982, through December 1, 1983; Monumental's *Excess* policy ran from October 12, 1982, through January 1, 1984. Those facts are undisputed. Moreover, all activities that Monumental was found liable for arose out of the Peoples/Monumental letter Agreement dated September 13, 1984; this Agreement was therefore executed more than nine months *after* USF & G's coverage had expired, and thus USF & G can in no way be responsible for any portion of the resulting judgment which arose from such an Agreement.

That notwithstanding, Monumental essentially concedes that Peoples' claims for libel or slander (*i.e.,* "standard" defamation) were time-barred, and thus could not trigger coverage. Monumental's argument on appeal is therefore limited to Peoples' North Carolina unfair and deceptive trade practices claim, which allegedly has a four-year statute of limitations.

---

**23.** Md.Cts. & Jud.Proc.Code Ann. § 5–105 (1989 Repl.Vol.).

**24.** *See* N.C.G.S. Section 75–1.1. Monumental now contends that Peoples, in the underlying suit, alleged that Monumental "disparaged" Peoples' policies pursuant to this North Carolina statute. Moreover, Monumental argues that such a claim for "disparagement" was part of Peoples' original federal complaint (Count 8), its amended federal complaint (Count 9), and its Demand for Arbitration (Count 7).

■ Even presuming, without so deciding, that a violation of the cited North Carolina statute *could* trigger coverage, we must still hold against Monumental because Peoples' claims were not raised in the appropriate forum (arbitration) until March 15, 1989. All such claims which arose before March 15, 1985 [25] are barred as against USF & G (whose policies with Monumental expired, at the very latest, on January 1, 1984).

## B. RELIANCE only

As discussed above, the lower court determined that "Monumental's claims of personal injury liability obligating a duty to defend do not come within Reliance's policy terms for three independent reasons." Those three reasons may be briefly summarized as follows: (1) exclusion 2(b) precludes personal injury coverage because the first publication of the disparaging material occurred prior to December 1, 1983; (2) exclusion 2(c) precludes personal injury coverage because the defamation claimed was "made by or at the direction of any Insured with knowledge of its falsity"; and (3) the defamatory personal injury claimed by Monumental to be within the policy was not "caused by an 'occurrence'."

Significantly, of these three independent grounds, Monumental has raised only the first and the third as issues

---

**25.** In the case *sub judice,* limitations were not tolled by the earlier federal court suit since the filing of a procedurally defective suit did not toll the statute. *See, e.g., Walko Corp. v. Burger Chef Systems, Inc.,* 281 Md. 207, 211–12, 378 A.2d 1100 (1977) (Absent a statutory provision saving the plaintiff's rights, a remedy is barred where limitations has run during the pendency of the defective suit). The rule in *Walko* was modified by Md.Rule 2–101(b), which became effective July 1, 1992:

**After Certain Dismissals.**—Except as otherwise provided by statute, if an action is filed in a United States District Court or a court of another state within the period of limitations prescribed by Maryland law and the foreign court enters an order of dismissal for lack of jurisdiction, because the court declines to exercise jurisdiction, or because the action is barred by the statute of limitations required to be applied by that court, an action filed in this State within 30 days after the foreign court's order of dismissal shall be treated as timely filed in this State.

before this court; *i.e.,* Monumental does *not* now seek to challenge the *second* independent ground whereby the lower court properly determined that exclusion 2(c) precludes personal injury coverage because the defamation claimed (by Peoples' in its complaints) was made by Monumental with knowledge of its falsity.

We have previously held that, where a lower court decision is supported by at least one properly decided independent ground, than we must affirm that decision. *Ellett, supra,* 66 Md.App. at 700, 505 A.2d 888. *See also DeGroft,* 72 Md.App. at 159, 527 A.2d 1316 (appellate court will not review issues not argued in appellant's brief). As the trial court in the case *sub judice* had a proper and independent ground upon which to base its decision, *i.e.,* Exclusion 2(c), we now must affirm that decision.

### *"Occurrences"*

Regarding personal injury coverage, Monumental's policy with Reliance stated as follows:

> [Reliance] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... personal injury or ... property damage to which this insurance applies, caused by an *occurrence,* and [Reliance] shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient[.]
> * * * *
>
> *"Occurrence* [means] an accident ... which results in personal injury ... neither *expected nor intended from the standpoint of the insured*[.]"

(Emphasis added.)

Monumental does not challenge the lower court's finding that the claims alleged by Peoples did not constitute an "occurrence" under the policy. Rather, Monumental con-

tends that the "occurrence" requirement itself is illusory, and therefore Reliance should have been mandated to provide coverage. To support this contention, Monumental cites *Liberty I, supra,* for the following proposition:

> The excess policy issued by defendant, Mission, is on a somewhat different footing as it purported to require an unexpected or unintended occurrence to trigger the coverage in any risk category.... Mission did, however, specifically insure for injuries arising out of the insured's actions which included libel, slander, defamation or unfair competition in connection with its advertising activities. Actions of that nature are not usually deemed unintentional or unexpected. To allow Mission to escape coverage at this stage of the proceeding under its definition of occurrence would make much or all of the advertising liability coverage illusory.

857 F.2d at 951.

We believe that, by so arguing, Monumental is confusing an intentional *act* (which forms the basis of much tort liability) with intended *results* (which precludes coverage under Reliance's policy). As indicated above, the policy defines an "occurrence" as an "accident ... which *results* in personal injury ... neither expected nor intended from the standpoint of the insured*[.]"* (Emphasis added.)

■ The distinction between intentional *acts* and intended *results* is both subtle and significant. An intentional *act* can result in both intended and unintended consequences. *See, e.g., Haynes v. American Casualty Co.,* 228 Md. 394, 396–99, 179 A.2d 900 (1962). Moreover, the "intentional" torts of defamation and unfair competition (both of which are at issue presently) can be committed without the actor *intending* to cause harmful *results. See, e.g., Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976) (defamation); *Quality Inns Int'l, Inc. v. McDonald's Corp.,* 695 F.Supp. 198, 209 (D.Md.1988) (unfair competition).

■ Consequently, there is nothing illusory about a liability policy that only provides coverage for activities that yield unintended results. Therefore, even had Monumental contested all three of the lower court's justifications, we would still be mandated to affirm.

III. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR CAL UNION ON MONUMENTAL'S OFFICERS' CLAIM FOR *D & O* COVERAGE UNDER A VALIDLY RESCINDED POLICY?

The following is a brief summary of the relevant facts regarding Cal Union's D & O coverage:

By application dated December 13, 1983, Monumental requested that Cal Union provide to Monumental D & O coverage. Prior to that application date, Monumental had hired at least three former officers of Peoples.[26] These, as well as numerous other alleged departures of Peoples' employees to Monumental, began to concern Peoples. A series of letters and conversations between the two companies ensued, including the two letters set forth in detail above: (1) Gregg's letter to Disharoon, dated November 30, 1983 (*i.e.*, thirteen days *before* Monumental applied to Cal Union for D & O insurance), and (2) Larry's Jenkins' letter to Simons, dated December 16, 1983 (*i.e.*, 3 days *after* Monumental applied to Cal Union).[27] Shortly thereafter, by

---

**26.** (1) In September, 1982, Monumental hired Larry Jenkins as an Executive Vice President; Jenkins had been previously employed as the President and CEO of Peoples; (2) approximately one month later, Monumental hired Brittingham as an Agency Vice President; Brittingham had been previously employed as a field Vice President at Peoples; and (3) in June, 1983, Gene Hines left Peoples to become a consultant with Monumental.

**27.** As indicated above, William P. Gregg was the President of Capital Holding Corporation (the parent company of Peoples); Leslie B. Disharoon was the Chairman of Monumental; Larry Jenkins was Chairman and CEO of Monumental; and Thomas Simons was the Chairman and CEO of Capital Holding Corporation.

letter dated January 17, 1984, Monumental and Peoples agreed to a five-month hiring moratorium.

In its December 13, 1983 application to Cal Union for insurance, Monumental was required to answer the following question (which was designated on the application as question number 13):

Is [Monumental] or any Director or Officer proposed for insurance aware of any fact, circumstance or situation involving [Monumental], its Subsidiaries or the Directors or Officers of the Company or its Subsidiaries which (s)he has reason to suppose might result in any future claim such as would fall within the scope of the proposed insurance?

Despite the fact that, at the time, Monumental was involved in activities that would subsequently form the basis of the Peoples/Monumental litigation (as indicated by, among other things, the above November 30 and December 16, 1983 letters), Monumental answered question 13 in the negative.

With respect to the case *sub judice*, Cal Union successfully argued in its Motion for Summary Judgment that the Cal Union policy accordingly must be rescinded or determined to exclude coverage because it was obtained without disclosure of Peoples' potential claims. In disposing of the summary judgment motion in favor of Cal Union (and against Monumental), the Circuit Court for Baltimore City (in adopting the two Memoranda Decisions of the U.S. District Court, dated June 6, 1991, and August 14, 1991, respectively) held as follows:

The first reason Cal Union is not liable is because this Court declares the policy void *ab initio*, finding that Monumental materially misrepresented its response to question 13 in the application for insurance. * * * * [Although Monumental argues that, due to the parties' on-going negotiations, it possessed subjective good faith in believing that all the problems with Peoples had been resolved, s]ubjective good faith hopes or beliefs [are] irrelevant to the question of material misrepresentation;

it is a reasonableness inquiry. Because the Court finds a material misrepresentation, the policy is rescinded and Monumental cannot recover under it. * * * *

The second reason Monumental cannot recover under Cal Union's policy is because the application, now part of the insurance contract[28], excludes any claims "emanating" from any knowledge of facts or circumstances which Monumental represented. * * * *

The third reason that Monumental cannot recover under the policy, even assuming the policy is not void *ab initio,* is that the Tribunal determined that any liabilities of the individual officers and directors who are insured under the policy are the responsibility of Monumental. The parties agree that the individual officers and directors were not signatories to the September 13, 1984, Agreement, and that individuals cannot be held liable for breaching contractual duties that only bind the corporation.

(Footnote added.)

Monumental now argues that the lower court erred when it held that (1) Monumental's "subjective good faith" was inapposite to the issue of material misrepresentation, (2) Cal Union was not liable because Monumental's officers were not individually liable on the September 13, 1984 Agreement in the underlying litigation, and (3) Cal Union sought to rescind Monumental's D & O policy in a timely fashion.

## A. *Grounds Not Appealed Sufficient to Uphold Lower Court*

■ As discussed above, the lower court's decision as to Cal Union rested on three independent grounds: (1) Monu-

---

**28.** The last paragraph of the application stated as follows:
Although the signing of this Proposal Form does not bind the undersigned, ... to effect insurance, the undersigned, on behalf of the Directors and Officers and the Company, *agrees that this form and the information furnished pursuant hereto shall be the basis of the contract should a policy be issued and this form will be attached to and become a part of this policy.*
(Emphasis added.)

mental made a material misrepresentation on its application
to Cal Union for D & O coverage, (2) the Cal Union policy,
by its terms, excludes any claims "emanating" from any
knowledge of facts or circumstances that Monumental rep-
resented, and (3) the individual officers and directors were
not signatories to the Agreement that was allegedly breach-
ed by Monumental (*i.e.*, the September 13, 1984 Agree-
ment), and thus the Peoples' lawsuit was outside the scope
of the D & O coverage. Significantly, of these three
independent grounds, Monumental has raised only the first
and the third as issues before this court; *i.e.*, Monumental
does not now seek to challenge the *second* independent
ground whereby the lower court determined that the *Cal
Union policy, by its terms, excludes from coverage* any
claims "emanating" from any knowledge of facts or circum-
stances that Monumental represented. Similarly, the lower
court properly determined (and Monumental also does not
challenge the fact) that Peoples' claims (*i.e.*, those claims
for which Monumental presently seeks coverage) *did in-
deed "emanate"* from the facts or circumstances that Mon-
umental represented in its application to Cal Union for D &
O coverage.

As discussed above, we have previously held that, where
a lower court decision is supported by at least one properly
decided independent ground, then we must affirm that
decision. *Ellett, supra,* 66 Md.App. at 700, 505 A.2d 888.
*See also DeGroft, supra,* 72 Md.App. at 159, 527 A.2d 1316
(appellate court will not review issues not argued in appel-
lant's brief). As stated above, since the trial court in the
case *sub judice* had a proper and independent ground upon
which to base its decision, we now must affirm that deci-
sion.

### B. *Individual Officer Liability*

■ Monumental also contends that the lower court erred
when it held, pursuant to the D & O policy, that Cal Union
need not indemnify Monumental because Monumental's offi-
cers *should* not have been held individually liable in the

underlying Peoples/Monumental litigation. With respect to this issue, Monumental's argument is scant, and is reproduced here in its entirety:

> Monumental's officers did not individually sign the September 13, 1984 Agreement. But the panel nonetheless found that they were liable for unfair competition. They remained judgment defendants through the present time, now appellants in the 4th Circuit.

In essence, Monumental employs a type of *post hoc* reasoning in an attempt to bootstrap coverage, to wit: Monumental argues that because in the *actual* outcome to the underlying suit Monumental's officers *were* found liable, Cal Union is mandated to provide coverage.[29] We disagree.

As stated above in this opinion, it is well-established in Maryland that the obligation of an insurer to defend its insured under a liability policy is determined by the *allegations* contained in the complaint, and not by the final disposition of the claims contained therein. *See, e.g., Oweiss v. Erie Ins. Exchange*, 67 Md.App. 712, 717, 509 A.2d 711 (1986). This is known as the so-called Exclusive Pleading Rule. *See, e.g., Eastern Shore Financial v. Donegal Mut.*, 84 Md.App. 609, 620, 581 A.2d 452 (1990). In light of the Exclusive Pleading Rule, and with respect to Cal Union's D & O coverage, Monumental has conceded that (1) the underlying Peoples/Monumental litigation boiled down to a dispute over an alleged breach of the September 13, 1984 Agreement[30], and (2) Monumental's officers did not

---

**29.** The phrase "actual outcome" (as such applies to the *underlying litigation* ) is to be distinguished from the holding of the lower court in the case *sub judice,* which determined that—contrary to the actual outcome—Monumental's officers *should not* have been held liable on the September 13, 1984 Agreement.

**30.** In its response to Peoples' Demand for Arbitration, Monumental conceded that, "[d]espite the rhetoric and various claims contained in the 'brief' of [Peoples], this case boils down to a breach of contract dispute." In this regard, Monumental's concession comports with the allegations of Peoples itself, which—in its Demand for Arbitration—

individually sign that September 13, 1984 Agreement. Consequently, irrespective of the *result* of the underlying litigation, the lower court properly determined that Monumental's D & O coverage with Cal Union was not invoked.

### C. *Timeliness of Cal Union's Rescission*

■ Cal Union rescinded Monumental's D & O policy in late November, 1990, after becoming sufficiently convinced that Monumental, and its officers and directors, had engaged in wrongdoing.[31] Monumental now seeks to challenge the timeliness of this rescission. Specifically, Monumental contends that Cal Union had sufficient grounds to rescind the D & O policy much earlier than late 1990. They base this contention largely on the following "facts": (1) on August 16, 1986, Cal Union received a copy of Peoples' U.S. District Court complaint, which contained allegations concerning Monumental's alleged wrongdoing; (2) on or before May 6, 1988, Monumental produced to *Peoples,* pursuant to Peoples' discovery request, the documents that Judges Nickerson and Kaplan subsequently found demonstrated Monumental's "actual knowledge" of its wrongdoing; and (3) most of the Monumental officials associated with those damning documents were deposed by Cal Union in *early* 1990. We discuss each of these three "grounds" respectively.

Even presuming, without so determining, that the August 16, 1986 complaint was both (1) actually and timely supplied to Cal Union, and (2) sufficient to provide Cal Union with "actual knowledge" of Monumental's alleged wrongdoing, the lower court's ruling must still be upheld.

---

stated that "this dispute arises out of an agreement dated September 13, 1984."

**31.** Indeed, Judges Nickerson and Kaplan found that Cal Union didn't have a sufficient basis to rescind until various officers and directors of Monumental admitted, at their respective depositions (in late 1990), that they had engaged in wrongdoing. It was only a matter of days after these depositions that Cal Union actually sought rescission.

Monumental relies on *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985). Monumental correctly points out that in *Finch* we held that

[a] plaintiff seeking rescission must demonstrate that he acted promptly after discovery of the ground for rescission. He must also show that he tendered to defendant all consideration and benefits received under the contract immediately after notice of the ground for rescission.

57 Md.App. at 244, 469 A.2d 867. The very next sentence in *Finch*, however, was *not* quoted by Monumental, but is nonetheless also relevant to the disposition of the case at bar:

"This effort to resume the status quo is required as, *if a party who knows the facts which would justify rescission,* does any act which recognizes the continued validity of the contract or indicates that he still feels bound under it, he will be held to have waived his right to rescind."

*Id.* (*quoting Lazorcak v. Feuerstein,* 273 Md. 69, 76, 327 A.2d 477 (1974); emphasis added). Therefore the appropriate focus of the lower court is *not* (as Monumental errantly contends) when the carrier learns of facts that raise the *mere potentiality* for rescission but, rather, the lower court must determine when the carrier learns the facts that would *justify* rescission.

In the instant case, it is undisputed which facts would actually *justify* rescission, to wit: Cal Union could *justify* rescission of Monumental's D & O policy *only* after it acquired sufficient proof that Monumental, and its officers and directors, had actually engaged in wrongdoing. For its part, Monumental itself spent considerable time, energy and money in the underlying litigation *denying* that it had engaged in any wrongdoing; we therefore find it curious that Monumental now contends that Peoples' U.S. District Court complaint could, of itself, form a sufficient basis for Cal Union to be justified in denying D & O coverage to Monumental. Consequently, the furnishing of Peoples'

1986 complaint to Cal Union could not—in and of itself—supply sufficient grounds to justify Cal Union in rescinding its policy.

 Similarly, even after considering Monumental's other two factual bases for its assertion that Cal Union didn't timely rescind[32], we still must uphold the lower court's ruling. Cal Union, of course, was not a party to the Peoples/Monumental litigation. The record reflects (1) that Cal Union, following the aforementioned early–1990 depositions, adequately attempted to investigate the matter more fully, but that (2) Monumental withheld from Cal Union necessary transcripts relating to the Peoples' litigation until *after* Cal Union had rescinded its policy. Consequently, under those circumstances, Cal Union cannot be seen as having waived any rights by "delaying" its decision to rescind. As other courts have noted, carriers themselves may risk bad faith allegations if they rescind too early, *i.e.*, before they have a solid basis to do so. *See, e.g., Fountain & Herrington, Inc. v. Mutual Life Ins. Co.*, 55 F.2d 120, 126 (4th Cir.1932); *Civil Service Employees Ins. Co. v. Blake*, 245 Cal.App.2d 196, 53 Cal.Rptr. 701, 705 (1966). We must therefore accord a fair amount of discretion to a carrier who seeks to rescind a policy, but who "delays" doing so while making a good faith attempt to investigate whether there are proper grounds for rescission.

As discussed above, Judges Nickerson and Kaplan found that Cal Union didn't acquire sufficient knowledge of Monumental's alleged wrongdoing until late November, 1990 (*i.e.*, only a few days before Cal Union actually rescinded its policy). We find no reversible error resulting from that determination.

---

**32.** As stated above, Monumental claims that (1) on or before May 6, 1988, it produced to *Peoples*, pursuant to Peoples' discovery request, the documents which Judges Nickerson and Kaplan subsequently found demonstrated Monumental's "actual knowledge" of its wrongdoing, and (2) most of the Monumental officials associated with those damning documents were deposed by Cal Union in *early* 1990.

## IV. DID THE LOWER COURT PROPERLY GRANT SUMMARY JUDGMENT FOR USF & G, CAL UNION, and RELIANCE ON THEIR COUNTERCLAIMS WHICH SOUGHT *RESTITUTION OF CONDITIONAL PAYMENTS* TOWARDS DEFENSE COSTS?

After Peoples filed its underlying lawsuit, Monumental notified the various carriers of the claim. Subsequently, three of the carriers—USF & G, Cal Union and Reliance— extended defense costs to Monumental in the respective amounts of $232,206.97, $225,717.43, and $277,486.23. In ruling on the various motions for summary judgment filed by the parties hereto, the lower court, *inter alia,* determined that the respective payments of USF & G and Cal Union to Monumental were conditionally made "under a full reservation of rights as to both coverage and liability regarding defense costs, ... subject to a later determination among the carriers as to coverage." [33] Consequently, in light of the lower court's determination that the carriers had no obligations to defend or indemnify under their respective policies, the court ordered Monumental to refund the amounts conditionally paid by USF & G and Cal Union. Monumental now argues that the lower court erred in that Monumental "should not be required to refund defense cost payments which were *not* conditional [on Monumental first establishing, as an absolute condition precedent, that the carriers had a duty to defend or indemnify Monumental]."

With respect to this issue, Monumental's argument in its brief before this court is essentially nonexistent, and is reproduced here in its entirety:

Space does not permit further argument here. Monumental adopts the argument set forth [in its Motion to Vacate the U.S. District Court's Judgment, as such is included in the Record Extract].

---

**33.** Issues concerning the payments advanced by Reliance are not currently before this court.

■■■ Pursuant to Md.Rule 8–504(a)(5), "A brief [filed before an appellate court] *shall* contain ... [an a]rgument in support of the party's position." (Emphasis added.) The use of the word "shall" indicates that the provision is mandatory, and that the consequences of noncompliance are those prescribed by the Maryland Rules or by statute. *See* Md.Rule 1–201(a). In the instant case, the effect of noncompliance with Rule 8–504—as in the case where a brief does not *contain* the party's argument, but merely *makes reference* to an argument contained elsewhere [34]—is set forth in Md.Rule 8–504(c):

> For noncompliance with this Rule, the appellate court may dismiss the appeal or make any other appropriate order with respect to the case[.]

Consequently, we need not—and, indeed, choose not to—consider the merits of Monumental's argument concerning the refund of the payments made by USF & G and Cal Union. *See also Rosenberg v. Rosenberg,* 64 Md.App. 487, 515 n. 7, 497 A.2d 485 (1985) (appellate court will not consider appellant's argument where, rather than setting forth that argument in his brief, he merely attempts to incorporate by reference a discussion that appears in a lower court memorandum); *DeGroft, supra,* 72 Md.App. at 159, 527 A.2d 1316 (appellate court will not review issues not argued in appellant's brief).

## V. ADMISSION OF COVERAGE

Monumental has raised one additional issue which may be disposed of in summary fashion.

---

**34.** The Rules indicate only one circumstance where a party may incorporate into its brief an argument by reference, to wit: In a case involving more than one appellant or appellee, any appellant or appellee may adopt by reference any part of the *brief of another.* Md.Rule 8–503(f). Although the case at bar does involve more than one appellee, Monumental is *not* attempting to incorporate by reference a portion of another party's brief, and thus Monumental is not now protected by Rule 8–503(f).

Monumental asserts that "[t]he most significant omission in the federal court's 63–page opinion was any mention of admissions by [USF & G, Reliance and US Fire] that their respective policies provided coverage here." In support of this assertion, Monumental quotes language from assorted letters written to Monumental by various officers and directors of USF & G, Reliance and US Fire. Each cited instance, *taken out of its original context*, appears to suggest that the respective carriers admitted coverage. After considering Monumental's argument in this regard, the lower court implicitly found that none of the carriers had, in fact, admitted coverage. We see no error in that finding.

The record reflects that initially, *and while they investigated Peoples' claims*, all carriers reserved all rights under their respective policies. Moreover, the record reflects that all three carriers made known the fact that they weren't guaranteeing coverage. We discuss each carrier respectively.

1. As to USF & G: Both in the letter that Monumental contends evidences USF & G's admission of coverage, and in a letter dated the very next day, USF & G indicated to Monumental that it was "closely examining" the "coverage question," and that USF & G wasn't "waiving any Company rights."

2. As to Reliance: In its very first letter to Monumental, as well as in several subsequent letters, Reliance expressly reserved (or confirmed its reservation of) any rights it had under the policy. Indeed, in a letter from Monumental to Reliance, Monumental itself expressly acknowledged that it "appreciate[d] [Reliance's] reservation of rights until further study and further developments."

3. As to US Fire: In his deposition, Monumental's own general counsel acknowledged that US Fire never admitted coverage. In response to the question, "Is it fair to say that at all times US Fire has denied that it ever had any defense obligations to Monumental since this claim was

brought to its attention?", general counsel tellingly responded, "I believe that's true, yes."

Under these circumstances, the record fails to reflect any admissions of the kind claimed by Monumental.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.