HOWARD N. ROBINSON, JR. v. NORTH CAROLINA FARM BUREAU IN-
SURANCE COMPANY

No. 8627SC334

(Filed 2 June 1987)

**Insurance § 136— fire insurance—refusal of insurer to pay—eventual payment no
bar to punitive damages**

> An insurer's eventual payment of a claim is no bar to punitive damages if
> its earlier denial meets the requirements of tortious conduct accompanied by
> aggravating circumstances. Evidence that defendant's agent viewed plaintiff's
> building as a total loss immediately after the fire and indicated prompt pay-
> ment of the full claim, that defendant delayed payment because plaintiff hired
> a property loss consultant, that defendant instructed a building contractor to
> produce a low estimate to do the repairs, and that defendant did not pay the
> $100,000 claim until seven months after the fire when an umpire set the loss at
> $170,000 was sufficient to establish a tortious bad faith refusal to settle in a
> timely manner, and evidence of defendant's instructions to the contractor to
> lower his estimate met the requirement of the accompanying aggravated con-
> duct. N.C.G.S. § 58-54.4(11).

APPEAL by plaintiff from *Burroughs, Judge.* Judgment en-
tered 12 February 1986 in Superior Court, GASTON County. Heard
in the Court of Appeals 28 August 1986.

*Whitesides, Robinson, Blue & Wilson by Henry M. White-
sides for plaintiff appellant.*

*Caudle & Spears by Lloyd C. Caudle and Harold C. Spears
for defendant appellee.*

COZORT, Judge.

In this case, plaintiff restaurant owner is the insured under a
multi-peril policy issued by the defendant insurance company. Af-
ter the restaurant was seriously damaged by fire, plaintiff filed
proof of loss claims requesting payment of the full $100,000.00 pol-

icy limit on the loss of the building and payment of the full $125,000.00 policy limit on the loss of the building's contents. The defendant paid the $125,000.00 on the contents claim within the time specified in the policy. The defendant denied that the building was damaged in excess of $100,000.00, offering instead to pay plaintiff $88,451.00. The plaintiff exercised his option under the policy to have the claim reviewed by appraisers and an umpire. After the report of the umpire was received, defendant paid the $100,000.00 building loss claim within the time specified by the policy. Defendant's payment of $100,000.00 was made seven months after the fire, five months after the plaintiff's initial submission of its proof of loss claims. Plaintiff filed this action, alleging, *inter alia*, that defendant's delay in paying the building claim was unreasonable and done in bad faith. He requested damages for loss of business, the loss of the use of the money, and punitive damages. The trial court granted defendant's motion for partial summary judgment, dismissing the claim for punitive damages. We vacate, finding that the plaintiff has alleged a claim for tortious bad faith refusal to pay, and further finding that there is a factual dispute as to whether the delay in payment was in fact motivated by bad faith. A more detailed recitation of pertinent facts follows.

Certain facts are not in dispute: The restaurant owned by plaintiff was extensively damaged by fire on 21 October 1981. The restaurant and its contents were covered by a Special Multi-Peril Policy issued by defendant, with stated limits of $100,000.00 for damage to the building and $125,000.00 for damage to the personal property contents. On or about 14 December 1981 defendant received from Reynolds & Sons Construction Co., a Charlotte General Contractor, a one-page written estimate stating that Reynolds could rebuild the restaurant for $88,451.00. On or about 18 December 1984 plaintiff filed with defendant two proof of loss claims, one claiming building damages of $170,350.00, in excess of the face value ($100,000.00) of the policy, and one claiming damage to contents of $185,260.23, in excess of the face value ($125,000.00) of the policy. On or about 18 January 1982, Reynolds submitted to defendant a second written estimate, in slightly more detail, which quoted the same price, $88,451.00, to repair the restaurant. On 27 January 1982, plaintiff's attorney received from the Charles P. Beam Company, Inc., a local contractor, a six-page letter which

concluded that Reynolds could not repair the building for $88,451.00. The Beam letter estimated the cost of repair to be $111,131.00. On 8 February 1982, defendant paid to plaintiff $125,000.00 on the contents claim. Defendant offered plaintiff $88,451.00 on the building loss. Plaintiff did not accept defendant's offer and named a local architect as an appraiser, in accordance with provisions of the policy. The defendant named Reynolds as its appraiser; and on 26 April 1982, the two appraisers, being unable to agree, selected an umpire who would set the loss, again in accordance with the provisions of the policy. On 28 April 1982, the umpire set the loss of the building at $170,000.00. On 17 May 1982, defendant paid plaintiff $100,000.00 for the building, the full amount of the policy.

The forecast of the evidence presented by depositions taken by the parties shows other facts to be in dispute. By way of deposition testimony, evidence for the plaintiff tends to show the following:

Plaintiff Howard N. Robinson, Jr., the owner of the restaurant, testified that Wayne Stanley, the defendant's field claims adjuster, came to the site of the fire on 21 October 1981, examined the damages, and told plaintiff there would be no problem in getting the money to rebuild the building. Stanley indicated defendant would pay the full claim. When Reynolds came out to look at the fire damage a few days later, Reynolds told plaintiff that it would take considerably more than $100,000.00 to repair the building. Shortly after the fire occurred, plaintiff hired the Baldwin Company, Property Loss Consultants, to help prepare the proof of loss documents for the insurance claims. In December of 1981, plaintiff spoke on the telephone to Ed Guffy, an agent with defendant, about his claim being paid. Guffy told plaintiff that Dewey Ellis, Claims Supervisor with the defendant, was upset that plaintiff had hired Baldwin, and that defendant would review the claim "to work it down as close as they could." Reynolds came back to look at the building a second time. Reynolds told plaintiff the defendant wanted Reynolds to review his estimate and cut it every way he could to lower his estimate.

Johnny Reuben Sellers, who worked for plaintiff Robinson when the fire occurred, testified that he was with plaintiff when Reynolds came to look at the restaurant. According to Sellers,

Reynolds said, "The insurance company had called him to come back to relook the thing over, and [Reynolds] made the statement that he was certain that everything was a total loss; and the insurance company had called him back to look things over to get him to figure everything as close as he could and to get the price of what he gave down a considerable amount . . . ." Sellers was also present when Stanley talked to plaintiff shortly after the fire. He heard Stanley say "it was very apparent it was a total loss, and that [plaintiff] would have his money in two or three days . . . ." Sellers was also with plaintiff when plaintiff spoke to Guffy on the phone about his claim. Plaintiff was using a speaker phone which allowed Sellers to hear the conversation. Sellers heard Guffy tell plaintiff that plaintiff was responsible for the delay by bringing in the Baldwin Company. According to Sellers, Guffy said, "We could have had this thing settled had you not brought them into the picture."

William Wesley Baldwin, the owner of the Baldwin Company, testified that Stanley told him on or about 17 December 1981 that the defendant would not pay the total amount on the building. Baldwin had one of his employees, Ben Skinner, working on the restaurant claim. Skinner went with Reynolds on 12 January 1982, to go over the damages at the restaurant. Baldwin wanted Skinner to go over the $88,451.00 estimate with Reynolds because that estimate was not specific enough to ascertain what work would be done. In Baldwin's opinion, the Reynolds estimate was ludicrous. It was not a quality piece of workmanship because it did not specify what work needed to be done. The estimate submitted by Reynolds would not be sufficient to settle a claim with any insurance company. In Baldwin's opinion, the amount estimated by Beam, $111,000.00, would not have been adequate to repair the restaurant.

The evidence forecast by defendant through depositions disputes that forecast by plaintiff in several respects. Wayne Stanley, the field claimsman or adjuster for defendant, testified that he never told plaintiff that the defendant would pay the full $100,000.00 on the building. Stanley denied telling Reynolds to bring back a low estimate to repair the restaurant.

Dewey Ellis, a claims supervisor with defendant, testified that he was responsible for the final approval of claims made to defendant. He had asked Reynolds to revise his estimate to "have

it broken down a little more to what it would take to put it back just like it was before the fire happened." Reynolds assured him that the building could be repaired for the amount in his estimate.

Earl H. Reynolds, Sr., the president of Reynolds & Sons Construction Co., testified that he suggested to plaintiff tearing down the entire structure in order to get the floor on one level; additions to the building had caused it to have floors on different levels. His inspection of the building showed that about one-third of the building had only smoke damage. He estimated the loss of the building as a 70% loss. The estimate he gave to defendant on this building was the way he normally gave estimates, without a breakdown. The defendant told him to go back and redo the estimate, to make it more specific. Reynolds denied ever saying to anyone that the defendant sent him back to get a lower estimate. His intention was to make a bid which would get him the job and allow him to make a profit. He did not know how much insurance was involved. He could have rebuilt the building for the bid he submitted ($88,451.00).

The plaintiff's sole argument on appeal is that the trial court erred in granting summary judgment on the punitive damages claim because there was a genuine issue of material fact concerning whether the defendant's conduct constituted a bad faith refusal to settle a valid insurance claim.

On a motion for summary judgment, the question before the Court is whether the pleadings, discovery documents and affidavits, viewed in the light most favorable to the non-movant, support a finding that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. G.S. 1A-1, Rule 56(c). (Citations omitted.)

*    *    *    *

The moving party must show the lack of a genuine issue of material fact and that it is entitled to judgment as a matter of law, either by demonstrating the non-existence of an essential element of each claim or by presenting a defense to plaintiff's claims as a matter of law. (Citations omitted.) If the material before the court at the summary judgment hearing would require a directed verdict for defendant at trial, defendant is entitled to summary judgment.

*Frendlich v. Vaughan's Foods*, 64 N.C. App. 332, 334-35, 307 S.E. 2d 412, 414 (1983).

Plaintiff contends that defendant had a duty to deal in good faith; and, if it did not do so, it is not absolved from punitive damages because it later performed as it should. Plaintiff argues that eventual payment of the claim is no bar to punitive damages if its earlier denial met the requirements of tortious conduct accompanied by aggravating circumstances. Defendant counters that there can be no tortious conduct when the defendant paid its policy limits within the time frame of the policy. The defendant argues that a claim for bad faith refusal to settle cannot exist where coverage is not denied, settlement is not refused, and the policy limits are timely paid.

We agree with the plaintiff's argument, and we hold the court erred in granting summary judgment on the punitive damages claim. In *Dailey v. Integon Ins. Co.*, 75 N.C. App. 387, 331 S.E. 2d 148, *disc. rev. denied*, 314 N.C. 664, 336 S.E. 2d 399 (1985), we considered what evidence is sufficient to support a claim for tortious, bad faith refusal to settle a claim when the refusal to settle is *also* a breach of contract. In reviewing recent cases, we stated the following:

> "[W]hen there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort may itself give rise to a claim for punitive damages." . . . "Even when sufficient facts are alleged to make out an identifiable tort, however, the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed." [*Newton v. Standard Fire Insurance Co.*, 291 N.C. 105, 111-12, 229 S.E. 2d 297, 301 (1976).] In the sense used here, aggravated conduct has long been defined to include "fraud, malice, gross negligence, insult, . . . wilfully, or under circumstances of rudeness or oppression, or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights." *Baker v. Winslow*, 184 N.C. 1, 5, 113 S.E. 570, 572 (1922).

*Id.* at 394, 331 S.E. 2d at 153-54.

We find nothing in the case law which *requires* that the tortious conduct be accompanied by a breach of the contract, even

though most, if not all, of the cases have as a factual background the insurance company's refusal to pay. We do not believe an action for punitive damages from tortious conduct is precluded when the company eventually pays, if bad faith delay and aggravating conduct is present. An insurance company is expected to deal fairly and in good faith with its policyholders. The North Carolina General Assembly has acknowledged that principle by its adoption of N.C.G.S. § 58-54.4. Under N.C.G.S. § 58-54.4(11), the law defines the following acts as unfair and deceptive acts or practices, if committed or performed with such frequency as to indicate a general business practice:

> e. Failing to affirm or deny coverage of claims within a reasonable time after proof-of-loss statements have been completed;
>
> f. Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;
>
> *　　*　　*　　*
>
> h. Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled . . . .

Considering the forecast of evidence in the light most favorable to the plaintiff, as we are required to do on defendant's motion for summary judgment, we find that the defendant's agent viewed the building as a total loss immediately after the fire and indicated prompt payment of the full claim ($100,000.00). The defendant delayed payment because the plaintiff hired a property loss consultant, and the defendant further instructed a building contractor to produce a low estimate to do the repairs. The defendant did not pay the $100,000.00 until seven months after the fire, when the umpire set the loss at $170,000.00. This evidence is sufficient to establish a tortious bad faith refusal to settle in a timely manner. The evidence of the defendant's instructions to the contractor to lower his estimate meets the requirement of the accompanying aggravated conduct. The defendant's evidence to the contrary is not to be considered for summary judgment purposes. That evidence is to be considered by the jury. The evidence forecast by the plaintiff would be sufficient for the jury to

infer that the defendant should have paid the full claim promptly because it had no basis upon which to deny it, that the refusal was in bad faith, and that the defendant's actions were designed solely to force the plaintiff to go through the independent appraisal process to receive the full claim.

In finding that the defendant was not entitled to summary judgment in this case, we are not establishing a rule that an insurance company is liable for punitive damages in every case wherein the value of the damages is disputed and the claimant ultimately wins in the independent appraisal process. But where, as here, the claimant forecasts evidence that the company's delay has no good faith basis in fact and is accompanied by aggravated conduct, the claimant is entitled to take his case of punitive damages to the jury.

The order granting summary judgment for defendant is vacated and the cause remanded for further proceedings.

Vacated and remanded.

Judges BECTON and JOHNSON concur.