**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-1033**

---

COLONY INSURANCE COMPANY,

    Plaintiff - Appellant,

  v.

CHARLES A. PETERSON; EVERGREEN COMPOSITE TECHNOLOGY, LLC; RANDOLPH BANK AND TRUST COMPANY,

    Defendants - Appellees,

  v.

EDWARD L. CLAYTON, JR.; HPB INSURANCE GROUP INCORPORATED,

    Third Party Defendants - Appellees.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., Chief District Judge.  (1:10-cv-00581-WO-LPA)

---

Argued:  May 15, 2014    Decided:  August 25, 2014

---

Before KING, WYNN, and FLOYD, Circuit Judges.

---

Affirmed by unpublished opinion.  Judge Wynn wrote the majority opinion, in which Judge King joined.  Judge Floyd wrote a dissenting opinion.

---

**ARGUED:** Reid C. Adams, Jr., WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Winston-Salem, North Carolina, for Appellant.  Patrick Michael Kane, SMITH MOORE LEATHERWOOD LLP, Greensboro, North

Carolina; James W. Bryan, NEXSEN PRUET, PLLC, Greensboro, North Carolina; Stephen G. Teague, TEAGUE, ROTENSTREICH, STANALAND, FOX & HOLT, PLLC, Greensboro, North Carolina, for Appellees. **ON BRIEF:** James R. Morgan, Jr., Jonathan R. Reich, WOMBLE CARLYLE SANDRIDGE & RICE, LLP, Winston-Salem, North Carolina, for Appellant. M. Jay Devaney, NEXSEN PRUET, PLLC, Greensboro, North Carolina, for Appellee Randolph Bank and Trust Company. Manning A. Connors, SMITH MOORE LEATHERWOOD LLP, Greensboro, North Carolina, for Appellees Evergreen Composite Technology, LLC and Charles A. Peterson. Lyn K. Broom, TEAGUE, ROTENSTREICH, STANALAND, FOX & HOLT, PLLC, Greensboro, North Carolina, for Appellees Edward L. Clayton, Jr. and HPB Insurance Group, Incorporated.

---

Unpublished opinions are not binding precedent in this circuit.

2

WYNN, Circuit Judge:

Plaintiff Colony Insurance Company ("Colony") appeals from a final judgment entered upon a jury verdict awarding $2,369,000 to Defendants Charles A. Peterson ("Peterson"), Evergreen Composite Technology, LLC ("Evergreen"), and Randolph Bank and Trust Company ("Randolph Bank") (collectively "Defendants") on their insurance claim. The jury found that Colony waived its right to rescind a commercial property policy issued to Defendants and was estopped from denying coverage for loss after a fire damaged a building covered by the policy. On appeal, Colony contends that the district court erred in denying its motion for judgment as a matter of law. For the reasons below, we affirm.

I.

In reviewing the denial of a motion for judgment as a matter of law, we must view and recite the evidence in the light most favorable to the non-movants. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).

Effective March 16, 2010, Colony, a Virginia insurance company, issued a commercial property policy insuring a 95,000-square-foot vacant building located at 501 Hamilton Road, Montezuma, Georgia ("the 501 building"). The policy named Evergreen, a Georgia corporation headquartered in North

3

Carolina, and its owner, Peterson, a North Carolina resident, as the insured. The policy also listed Randolph Bank, a community bank in Randolph County, North Carolina, as a mortgage holder and loss payee under the policy. The policy provided coverage limits of up to $1 million for the 501 building and $3.5 million for the business-related personal property on the site.

Peterson had obtained loans from Randolph Bank to launch Evergreen, which manufactured composite wood products used in residential decking, fencing, and railings. As collateral for its loans, Randolph Bank held a deed of trust on the 501 property and perfected a security interest in the equipment located there. By late 2009, Evergreen had suspended its operations and was in default on its loans from Randolph Bank.

In February 2010, a fire, caused by arson, damaged a nearby building also owned by Evergreen ("the 261 building"). Thereafter, upon learning that the insurance on both buildings had lapsed, Randolph Bank engaged third-party defendant Edward Clayton ("Clayton"), an insurance agent with HPB Insurance Group, to assist in obtaining insurance coverage for the 501 building. The policy issued by Colony insured the 501 building against, among other things, risk of loss caused by fire. To mitigate this risk, the policy contained an endorsement requiring certain fire protective safeguards.

4

Specifically, the fire protective safeguards endorsement required Evergreen and Peterson to maintain an automatic sprinkler system, fire extinguishers, and functioning utilities at the 501 building. The fire protective safeguards endorsement stated that Colony would "not pay for loss or damage caused by or resulting from fire if, prior to the fire," the named insured "[f]ailed to maintain any protective safeguard . . . in complete working order" or "[k]new of any suspension, malfunction or impairment in any protective safeguard" and failed to notify Colony. J.A. 114.

On the same day that Colony issued the policy, it retained an independent vendor, Safety Resources, to inspect the 501 building. Colony charged Defendants a $250 non-refundable inspection fee, which was separate from the $18,000 policy premium. According to the policy, the inspection "relate[d] only to insurability and the premiums to be charged." J.A. 75. The inspection provided Colony "the chance to independently look at the risk that it [was] insuring." J.A. 454. By paying the $250 fee, Defendants expected Colony "to notify [them] if problems were identified by the inspection" so that they could remedy them. J.A. 1376.

Safety Resources inspected the 501 building on April 13, 2010 and prepared a written report, which noted that the utilities for the 501 building were off and that there was no

5

heat. This contradicted information provided to Colony during the insurance application process. Specifically, Clayton had submitted a "Specialty Property Vacant Supplement" form that indicated that the power and heat would remain on at the 501 building during vacancy. Colony received the inspection report on April 21, 2010, but the underwriter at Colony did not review the report until June 18, 2010. Nevertheless, Colony issued a mortgagee endorsement on April 22, 2010, and a loss payee endorsement on May 6, 2010, both with retroactive effect as of March 16, 2010, and naming Randolph Bank as a mortgagee and loss payee on the policy.

On May 18, 2010, a fire damaged the 501 building and its contents. Firefighters discovered that the two valves controlling the sprinkler system had been turned off. Evidence at the scene indicated that the valves had likely been "tampered with and vandalized." J.A. 761.

Colony subsequently denied coverage for the loss and sought a declaratory judgment regarding its indemnity obligations under the policy. Colony argued that material misrepresentations on the insurance application rendered the policy void and that breach of the fire protective safeguards endorsement precluded coverage. Defendants counterclaimed for breach of contract. Evergreen and Peterson also asserted a cross-claim against

Randolph Bank and filed a third-party complaint against Clayton and HPB Insurance Group.

All parties sought summary judgment, which the district court denied. Regarding Colony's claims, the district court held that genuine issues existed "as to whether the doctrines of waiver/estoppel prevent Colony from contesting coverage under the [p]olicy." J.A. 355. Accordingly, the case proceeded to trial.

At trial, Defendants introduced deposition testimony by Roseanne Gauthier, the senior underwriter at Colony responsible for determining whether the conditions of insurance for the 501 building were met. In her testimony, Gauthier acknowledged that she received the inspection report from Safety Resources on April 21, 2010, but that she "just did not get to the inspection by the time the loss occurred." J.A. 1051. Gauthier stated that had she reviewed the inspection report when she received it, she would have "immediately" taken steps to cancel the policy. J.A. 1053.

Defendants also presented evidence of other Colony underwriting files in which discrepancies appeared between some of the representations made on insurance applications and the conditions revealed by Colony's inspections. Regarding those files, Colony did not seek to rescind, and policyholders remedied the conditions or paid higher premiums.

At the conclusion of the evidence, Colony moved for judgment as a matter of law. The district court took the motion under advisement and allowed the case to go to the jury. The jury returned a verdict in favor of Defendants, finding that although a material misrepresentation appeared on the insurance application and that a condition of the fire protective safeguards endorsement requiring functioning utilities to remain on had been breached, Colony had nonetheless waived its right to rescind the policy and was estopped from denying coverage. Further, the jury determined that Randolph Bank was not responsible for the misrepresentation on the application. The jury awarded Defendants $2,369,000 on their counterclaim for coverage under the policy, and the court awarded pre-judgment interest.

On December 3, 2012, the district court denied Colony's motion for judgment as a matter of law and subsequently entered final judgment in favor of Defendants. This appeal followed.


II.

Colony argues that the district court erred in denying its motion for judgment as a matter of law. "We review de novo the grant or denial of a motion for judgment as a matter of law[,]" Anderson v. Russell, 247 F.3d 125, 129 (4th Cir. 2001), to determine whether "a reasonable jury would not have a legally

8

sufficient evidentiary basis to find for the [non-moving] party[.]" Fed. R. Civ. P. 50(a)(1).[1] "If, viewing the facts in the light most favorable to the non-moving party, there is sufficient evidence for a reasonable jury to have found in [the non-moving party's] favor, we are constrained to affirm the jury verdict." Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001).

We note that North Carolina law governs our analysis of this diversity case. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Thus, we first look to see if the Supreme Court of North Carolina has spoken on this issue; if not, we must predict how that court would rule on it. Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005).[2] In forming that prediction, we may consider opinions from the North Carolina Court of Appeals, teachings of treatises, and practices of other states. Id.

---

[1] Colony did not pursue any post-verdict motions under Rule 50(b) or Rule 59. As a result, Colony may not challenge the sufficiency of the evidence supporting the jury's verdict. Belk, Inc. v. Meyer Corp., 679 F.3d 146, 154-55 (4th Cir. 2012).

[2] Unlike other states within our circuit, there is no mechanism for certifying questions to the Supreme Court of North Carolina. See SunTrust Bank, N.A. v. Macky, 669 F.3d 177, 182 n.* (4th Cir. 2012).

9

A.

Colony contends that the district court should have granted judgment as a matter of law because the jury determined that Peterson or Evergreen breached the fire protective safeguards endorsement. Colony asserts that maintaining functioning utilities, as required by the fire protective safeguards endorsement, was a condition of coverage immune to waiver, and that the district court therefore erred in denying judgment as a matter of law.

Under North Carolina law, an insurer may waive "a provision or condition in an insurance policy which is for its own benefit." Brandon v. Nationwide Mut. Fire Ins. Co., 271 S.E.2d 380, 383 (N.C. 1980). North Carolina courts have long held that

> the breach of any condition in [an insurance] policy, as against an increase of risk or by keeping of certain hazardous goods . . . or, indeed, the violation of any of the conditions of the policy, may be waived by the insurer; and a waiver may be implied from the acts and conduct of the insurer after knowledge that such conditions have been broken.

Blue Bird Cab Co. v. Am. Fid. & Cas. Co., 15 S.E.2d 295, 301 (N.C. 1941) (alteration in original) (quotation marks omitted). Similarly, an insurer may be estopped from denying coverage under an insurance policy. Estoppel arises if the insurer's "actions or silence when [it] ought to have spoken, intentionally or through culpable negligence, induce[s] [the insured] to believe . . . coverage exist[s]" and the insured

10

relies upon such belief to his or her detriment.  United States Fid. & Guar. Co. v. Country Club of Johnston Cnty., Inc., 458 S.E.2d 734, 740 (N.C. App. 1995).

The Supreme Court of North Carolina has not spoken directly on the precise issue in this matter, but the decisions of that state's second highest court, the North Carolina Court of Appeals, provide us with guidance.  See Twin City Fire Ins. Co., 433 F.3d at 369.  In that regard, we find Durham v. Cox particularly illuminating.  310 S.E.2d 371 (N.C. App. 1984).

In Durham, the North Carolina Court of Appeals determined that material issues of fact existed as to whether the defendant insurance company waived its right to deny coverage under a homeowner's policy for loss following a fire.  310 S.E.2d at 376-77.  The policy stated that "[t]his coverage excludes structures used in whole or part for business purposes."  Id. at 373.  In breach of this provision, the insured plaintiff used the building, a garage, in connection with his furniture upholstery business, but asserted that such use was known to the insurer, resulting in waiver.  Id. at 373-74.  The insurer argued that the policy exclusion was a "matter of coverage" that could not be expanded by waiver or estoppel as a matter of law. Id. at 374.

On appeal from summary judgment in favor of the insurer, the North Carolina Court of Appeals reasoned that waiver and

11

estoppel "properly apply" to the business use exclusion "since the property itself, an appurtenant structure, and the risk, loss due to fire, [were] already within the coverage of the policy." Durham, 310 S.E.2d at 376. Thus, the risk of loss to the covered property due to fire was an "accepted risk" subject to forfeiture, rather than an "excepted risk" immune from waiver:

> The distinction between an accepted risk to be defeated by conditions set forth in the policy and an excepted risk is clear, and it is logical to hold that it takes a new contract to cover an excepted risk. By way of illustration: A. has a plantation on which there are 10 buildings. All are covered by a policy of insurance, but the policy provides that, in case A. shall store certain inflammable materials in any of the houses, then the insurance on that building shall instantly cease. That is an assumed risk, which will be void upon a condition subsequent. B. has a plantation upon which there are 10 buildings; 9 of them are covered by a policy of insurance. Building No. 10 is excluded from the policy. It is entirely logical to hold that it takes a new contract to include insurance on B.'s No. 10, but not on A.'s No. 10.

Id. (citation omitted); accord United States Fid. & Guar. Co., 458 S.E.2d at 739.

Applying this distinction between accepted and excepted risk, the North Carolina Court of Appeals determined that using the garage for business purposes did not create an entirely new risk. Rather, such use "enhance[d] a risk already assumed by the insurer"—namely, the risk of fire destroying a covered structure. Durham, 310 S.E.2d at 376. Moreover, observed the

12

court, "conditions regarding permissible or prohibited uses to which the property may be put are clearly inserted in the policy for the benefit of the insurer and therefore may properly be waived by it or its authorized agent." Id. at 376-77. Accordingly, the court held that the insurer could waive the policy provision excluding coverage for business use. Id. at 377.

Turning to the facts at issue here, the relevant part of the fire protective safeguards endorsement states:

> A. The following is added to the COMMERCIAL PROPERTY CONDITIONS:
> PROTECTIVE SAFEGUARDS
> 1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the [s]chedule above.

J.A. 113. The protective safeguards schedule specifies that "ALL UTILITIES MUST REMAIN ON AND FUNCTIONING." J.A. 113. Further, the fire protective safeguards endorsement adds the following language to the exclusions section of the policy:

> We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:
>
> 1. Knew of any suspension, malfunction or impairment in any protective safeguard listed in the [s]chedule above and failed to notify [Colony] of that fact;
>
> 2. Failed to maintain any protective safeguard listed in the [s]chedule above in complete working order[.]

J.A. 114.

13

There is no dispute that the policy issued by Colony expressly insured the 501 building against the risk of loss due to fire. As such, the loss that occurred was contemplated by the parties and encompassed by the policy. See Durham, 310 S.E.2d at 376 (broadly viewing the risk of loss to property by fire as covered, notwithstanding a business use exclusion). By requiring Defendants to maintain functioning utilities, the fire protective safeguards endorsement limited Colony's exposure to risk it had already "accepted"—namely, risk of loss to the 501 building posed by fire. Id.

Consequently, we agree with the district court that "applying the doctrines of waiver/estoppel to the conditions at issue in this case would not expand the [p]olicy to cover risks not currently contemplated by that agreement–i.e., that fire may destroy the subject property." J.A. 323. Accordingly, the district court did not err by submitting the issues of waiver and estoppel to the jury. And Colony's arguments to the contrary are unavailing.

Colony also argues that, under United Capitol Ins. Co. v. Kapiloff, waiver did not apply as a matter of law because insufficient time had passed between Colony's receipt of the inspection report and the fire. Again, we disagree.

First and foremost, Kapiloff, on which Colony's argument heavily relies, required us to apply Maryland, not North

14

Carolina, law. 155 F.3d 488 (4th Cir. 1998). "No one doubts that a federal court called upon to adjudicate a state law claim in the diversity jurisdiction must apply the relevant state law in determining the substantive rights and duties of the parties . . . ." Auer v. Kawasaki Motors Corp., U.S.A., 830 F.2d 535, 537 (4th Cir. 1987) (en banc). Here, that relevant state law is North Carolina's.[3]

Turning, then, to North Carolina law, "[w]aiver by an insurer of a forfeiture provision in an insurance policy requires (1) 'knowledge on the part of the insurer of the pertinent facts,'. . . , and (2)'conduct thereafter inconsistent with an intention to enforce the condition'. . . ." Mabry v. Nationwide Mut. Fire Ins. Co., 422 S.E.2d 332, 334 (N.C. App. 1992) (quoting Gouldin v. Inter-Ocean Ins. Co., 102 S.E.2d 846, 849 (N.C. 1958)). "When the evidence is sufficient to justify, but not require, a finding of waiver on the part of the insurer, then the issue of waiver is one to be determined by the jury." Id. (citing Gouldin, 102 S.E.2d at 851 (because the evidence of

---

[3] The dissenting opinion, too, focuses on Kapiloff. Undoubtedly, that opinion includes some broad statements and few citations, as the dissent notes. Those stylistic choices do not, however, change the fact that "[t]here is no federal general common law[,]" Erie, 304 U.S. at 78, and that North Carolina law governs this dispute.

15

waiver was "susceptible of diverse inferences, it is improper for the presiding judge to give the jury a peremptory instruction"); and Brandon, 271 S.E.2d at 385 (noting that "the evidence in this case is sufficient to permit, but not compel, a jury to find that defendant, by words or conduct, waived the requirement of proofs of loss [and] [t]he defendant's evidence does not, as a matter of law, compel a contrary conclusion" and thus "hold[ing] that the issue of waiver should have been submitted to the jury")).

Here, sufficient evidence existed for a reasonable jury to determine that Colony had "'knowledge . . . of the pertinent facts.'" Mabry, 422 S.E.2d at 334 (quoting Gouldin, 102 S.E.2d at 849). The inspection paid for by Defendants and conducted by Colony's independent vendor revealed that the utilities were off at the 501 building, in contravention of the fire protective safeguards endorsement. Colony received this information from Safety Resources on April 21, 2010, approximately four weeks before the May 18, 2010 fire. And in North Carolina, "an insurance company is presumed to be cognizant of data in the official files of the company[.]" Gouldin, 102 S.E.2d at 849.

Further, sufficient evidence existed for a reasonable jury to determine that Colony engaged in "'conduct thereafter inconsistent with an intention to enforce the condition.'" Mabry, 422 S.E.2d at 334 (quoting Gouldin, 102 S.E.2d at 849).

16

Although Colony knew for weeks that the utilities were off, it neither informed Defendants of the violation nor took steps to cancel the policy. See Faircloth v. Ohio Farmers Ins. Co., 117 S.E.2d 404, 408-09 (N.C. 1960) ("Equitably, if [the insurer] did not desire to carry the risk longer, because of the [breach of the policy conditions], it ought, in fair dealing, to have returned the unearned premium, and rescinded the insurance contract, so that plaintiff could have known he no longer was protected thereby and would have been afforded an opportunity to obtain a new policy from another agent."). Instead, Colony confirmed coverage by issuing a mortgagee endorsement on April 22, 2010, and a loss payee endorsement on May 6, 2010, naming Randolph Bank as a mortgagee and loss payee on the policy.[4]

Moreover, testimony by Colony's underwriter, Roseanne Gauthier, contradicts Colony's assertion that the time period between receipt of the inspection report and the fire was inadequate to permit a finding of waiver. Gauthier testified

---

[4] The dissent cites Nelson v. Hartford Underwriters Ins. Co., 630 S.E.2d 221 (N.C. App. 2006), for the notion that "only a few weeks" provides an insurer with little time to affirm or deny coverage. Id. at 233. Notably, however, at issue in Nelson was whether the insurer's failure to make a coverage determination within nineteen days of receiving a re-investigation report of a previously-denied claim constituted an unfair and deceptive trade practice. Id. The facts and issues in play in Nelson have little in common with, and shed little light on, those before us here.

17

that if she had reviewed the inspection report on April 21, 2010, when she received it, she would have "immediately" taken steps to cancel the policy.  J.A. 1053.

North Carolina's highest court has underscored that forfeiture "is not imposed as a penalty for making a false statement, which the insurer may invoke at his pleasure at any time, regardless of its own antecedent conduct.  It is based on the principle that the insurer has been misled to its damage." Hicks v. Home Sec. Life Ins. Co., 39 S.E.2d 914, 916 (N.C. 1946).  Crucially, however, an insurer "is not misled when it knows the facts; and when that knowledge exists or is acquired, it becomes the right and the duty of the insurer" to act.  Id. at 916-17.  And a failure to do so "will operate as a waiver." Id.[5]

Based on the proffered evidence and the pertinent North Carolina law, a reasonable jury could determine that Colony was not misled because it knew the facts, and that Colony had the right and the duty to act but failed to do so.  Accordingly, we must agree with the district court that we "cannot say that the

---

[5] We concern ourselves neither with homogenizing state laws for fear that insurance companies will otherwise need to "operate drastically differently across state lines" nor with "the day-to-day realities of the business."  Post at 32. Instead, we stick to our business, which is using North Carolina substantive law to decide the issues presented by this appeal.

27 days between the time Colony received the inspection report and the fire was insufficient, as a matter of law, for Colony to take action on the inspection as provided—especially in light of testimony that had the inspection been reviewed, immediate action would have occurred." J.A. 323. The district court therefore properly submitted the waiver issue to the jury and did not err in instructing the jury that it could find waiver. And "we are constrained to affirm the jury verdict." Lack, 240 F.3d at 259.

In sum, we conclude, based on North Carolina law, that the fire protective safeguards endorsement set forth in Colony's policy is a provision of forfeiture subject to waiver and estoppel, that the issue was properly submitted to the jury, and that there existed "sufficient evidence for a reasonable jury to have found in [Defendants'] favor, [such that] we are constrained to affirm the jury verdict." Lack, 240 F.3d at 259.

B.

Next, Colony contends that it is entitled to judgment as a matter of law because the jury determined that there was a material misrepresentation on the insurance application regarding whether heat and power would be on at the 501 building. Although Colony correctly notes that a material misrepresentation on an insurance application may forfeit

19

coverage, see Gore v. Assurance Co. of Am., 704 S.E.2d 6, 12 (N.C. App. 2010), waiver and estoppel may overcome a material misrepresentation, and such a question is for a jury to resolve. See, e.g., Cullen v. Valley Forge Life Ins. Co., 589 S.E.2d 423, 428 (N.C. App. 2003). Accordingly, the district court did not err in allowing the jury to decide whether Colony had waived its right to rescind the policy, notwithstanding the misrepresentation on the application.[6]

## III.

We have reviewed and summarily reject all of Colony's arguments. The judgment of the district court is therefore

AFFIRMED.

---

[6] Not least given our resolution of the issues above, we reject Colony's arguments as regards Randolph Bank, including Randolph Bank's status as an innocent mortgagee.

20

FLOYD, Circuit Judge, dissenting:

I agree with the majority that prolonged inaction by an insurer can amount to a waiver of rights under an insurance policy if the insurer has received notice of a breach of a requirement and takes no steps to notify the insured of the breach within a reasonable time. However, in this case, and as a matter of law, Colony could not be said to have waived the endorsement provision of the insurance policy on account of its inaction during the twenty-seven days between its receipt of the inspection report on April 21, 2010, and the burning of the 501 building on May 18, 2010. Accordingly, I think that the district court erred by submitting to the jury Issues 4 and 5 regarding waiver and estoppel in the first instance, and I therefore would reverse the district court's denial of Colony's Rule 50(a) motion and respectfully dissent to the majority's contrary conclusion. I would also remand this case for trial on the sole issue of whether Randolph Bank had knowledge that the utilities were off and failed to notify Colony pursuant to the policy.

I.

It has long been the law in North Carolina that "[u]pon being informed of [a breach], [an insurer] should within a reasonable time . . . notif[y] the insured of its determination

21

to cancel the policy[.]" Horton v. Home Ins. Co., 29 S.E. 944, 946 (N.C. 1898) (emphasis added); see also Dailey v. Integon Gen. Ins. Corp., 331 S.E.2d 148, 154–55 (N.C. Ct. App. 1985) (insurer's responsiveness assessed for reasonableness). It is also well established that "time . . . may be so short or so long that the court will declare it to be reasonable or unreasonable as a matter of law." Claus-Shear Co. v. E. Lee Hardware House, 53 S.E. 433, 434 (N.C. 1906). Although Claus-Shear Co. was a contractual dispute pertaining to the delivery of goods, the principle regarding temporal reasonableness as a matter of law has been applied widely by North Carolina courts. See, e.g., Harris v. Lamar Co., 563 S.E.2d 642, 2002 WL 1013571, at *4 (N.C. Ct. App. May 21, 2002) (unpublished table decision) (opinion by Wynn, J.) (quoting the above text from Claus-Shear Co. in a property case presenting the question of whether a billboard should be considered "abandoned"). Thus, I see no reason to limit its import in this case.

The North Carolina Supreme Court has not spoken regarding what time period is reasonable for an insurer to receive an inspection report and to process that report and notify the insured of any deficient conditions or breaches. Therefore, we must look to secondary indicia to try to predict how the North Carolina Supreme Court would rule in such a case, including, inter alia, opinions from the North Carolina Court of Appeals

22

and the practices of other states.  <u>Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.</u>, 433 F.3d 365, 369 (4th Cir. 2005).  As between these two secondary sources, North Carolina's "intermediate appellate court decisions constitute the next best indicia of what state law is, although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise."  <u>Liberty Mut. Ins. Co. v. Triangle Indus., Inc.</u>, 957 F.2d 1153, 1156 (4th Cir. 1992) (citation omitted) (internal quotation marks omitted).  For the reasons that follow, both North Carolina appellate decisions and the practices of other states, together and separately, yield the conclusion that, as a matter of law, Colony could not have waived the endorsement provision of the insurance policy.

A.  North Carolina Law

As the majority notes, waiver requires "(1) knowledge on the part of the insurer of the pertinent facts" and "(2) conduct thereafter inconsistent with an intention to enforce the condition which leads the insured to believe that he is still protected by the policy."  <u>Mabry v. Nationwide Mut. Fire Ins. Co.</u>, 422 S.E.2d 332, 334 (N.C. Ct. App. 1992) (citation omitted) (internal quotation marks omitted).  As to the first criterion, the majority claims that Colony had knowledge of the utilities

23

being off at the 501 building simply by virtue of Colony's receipt of the inspection report on April 21, 2010. See ante at 17 (citing Gouldin v. Inter-Ocean Ins. Co., 102 S.E.2d 846, 849 (N.C. 1958) ("[A]n insurance company is presumed to be cognizant of data in the official files of the company, received in formal dealing with the insured."[1])). But surely, the majority does not mean to extract from Gouldin the notion that an insurer has no time whatsoever after receiving an inspection report to process that report and run it up the corporate flagpole to be reviewed by the appropriate personnel and decision-makers. Indeed, North Carolina's appellate courts appear to recognize that some time period is necessary between receipt of information and action on that information.

For example, in Nelson v. Hartford Underwriters Insurance Co., an insurer received an inspection report regarding the condition of the insured property on July 17, 2002, but on August 5, 2002—nineteen days later and "before [the insurer] had made its determination of whether the . . . claim was covered by the policy"—"plaintiffs' counsel sent [to the insurer] a letter directing it to have no further contact with plaintiffs[.]" 630

---

[1] I note that Colony did not receive the inspection report from Peterson and Evergreen (the insured), but rather from an independent third party (Safety Resources). Nonetheless, I assume, arguendo, that this difference is immaterial here.

24

S.E.2d 221, 233 (N.C. Ct. App. 2006). Plaintiffs then sued the insurer for failing to affirm or deny coverage "within a reasonable time." Id. In holding that the insurer did not act unreasonably for not having responded to plaintiffs on or before August 5, the court noted that "[t]he report . . . was provided to [the insurer] only a few weeks before [the insurer] was warned not to have any contact with plaintiffs, providing little time for [the insurer] to determine whether it should cover a claim it had previously denied." Id. Although nineteen days is fewer than twenty-seven days, the court's use of "only a few weeks" (emphasis added), and the description of nineteen days as "little time," certainly indicates that the insurer would have been allowed additional time to respond.[2] See also Meadlock v. Am. Family Life Assurance Co., 729 S.E.2d 127, 2012 WL 2891079, at *7 (N.C. Ct. App. July 17, 2012) (unpublished table decision) (in light of a lack of evidence or authority to the contrary,

---

[2] The majority attempts to discount Nelson by splitting the finest of hairs based on the facts, see ante at 18 n.4, but provides no case-to-case analyses of its own for its cited cases. Rather, the majority opinion is long on statements of law and instances in which waiver was found, see id. at 16, but devoid of application of that law and the facts of the cited cases to the facts here. Absent guidance from the North Carolina Supreme Court as to what time period is "reasonable" for an insurer to respond under these circumstances, and absent a case with more similar facts and arriving at an alternative outcome, Nelson actually provides an excellent analogy from which much can be gleaned. Any other characterization of Nelson is, quite simply, disingenuous.

25

insurer's delay of four months was not unreasonable); cf. N.C. Gen. Stat. § 20-279.21(b)(3)(a.) ("Suit may not be instituted against the insurer in less than 60 days from the posting of the first notice of the injury or accident to the insurer[.]").

As to the second waiver criterion, the majority asserts that Colony's inaction during the twenty-seven days after receiving the inspection report provides the requisite evidence of conduct that is "inconsistent with an intention to enforce the condition," Mabry, 422 S.E.2d at 334. But this argument is built upon the false premise that Colony had "knowledge" of the condition in the first instance. Neither the majority nor Peterson and Evergreen dispute the accuracy or execution of Colony's internal review procedure upon receipt of an inspection report. Specifically, Colony describes, at pages 18-19 of its brief, its internal review procedure as follows:

> The initial review [by an assistant underwriter] is simply to determine if the inspector has made any recommendations, and to direct the underwriter's attention to those recommendations. It [is] not the underwriting assistant's responsibility to compare the inspection results against the conditions of coverage, or to confirm that all conditions of coverage had been met. . . . [T]he underwriting assistant . . . reviewed the 'recommendations' portion of the Inspection report on April 21, 2010, and then passed them on to the underwriter . . . . The 'Recommendations Section' of the report . . . said nothing about the utilities in the 501 building.

(Paragraph break omitted.)

26

In view of the above-described (and uncontested) practice at Colony, the majority's argument that waiver must be found because Colony's underwriter testified that she would have "immediately" taken steps to cancel the policy had she reviewed the pertinent part of the inspection report is a red herring. In essence, the relevant portion of the inspection report had not been reviewed, and thus, Colony cannot be imputed with knowledge of the information contained in the "recommendations" section of the report until the appropriate personnel—Colony's underwriter—had reviewed that section. Moreover, neither the majority nor Peterson and Evergreen argue that the internal review procedures at Colony are unreasonable and/or out of the ordinary for the insurance business, and to hold that knowledge was imputed on April 21, 2010, simply because Colony's assistant underwriter reviewed the inspection report would be to impute knowledge on any individual at Colony who handled the report.

In sum, notwithstanding the majority's statements of pure law, when North Carolina law—most pertinently Nelson—is applied to the facts of this case, it is unquestionable that North Carolina's appellate decisions counsel in favor of providing to insurance companies a grace period for processing documents during which waiver cannot be found as a matter of law.

B.  Practices of Other States

When looking to the practices of other states, my principal reason for positing that Colony could not have waived the endorsement provision is this Court's ruling in United Capitol Insurance Co. v. Kapiloff, 155 F.3d 488 (4th Cir. 1998).  In Kapiloff, this Court held that an insurer was not considered to have waived a condition/requirement of building occupancy that the insured failed to meet prior to a fire destroying the subject property, even though the insurer had knowledge of the insured's noncompliance via a property inspection and did not inform the insured about the inspection results.  Id. at 497.  Specifically, the building inspection took place in January and the losses occurred in February and March of the same year.  The insurer, however, did not deny coverage to the insured until December of that year.  Id. at 491.  In holding that the occupancy requirement was not waived, this Court stated the following:

> [T]he amount of time it took for [the insurer] to determine that the [insured's] properties were not in compliance with the policy would not, as a matter of law, be long enough in any event to constitute a waiver of any right under the policy. . . .  In making coverage decisions, an insurance company must be entitled to a sufficient time to collect the facts, evaluate them, and make legal determinations with respect to those facts.  These activities require not only field work but also an internal evaluation with a review by appropriate personnel. The one or two months urged by the [the insured] as supporting the finding of waiver or estoppel would hardly provide an

28

> insurance company with adequate time to make this kind of a decision, particularly when its liability for a wrongful decision could expose it to the risk of bad faith.

Id. at 497.

As noted above, the fire at the 501 building occurred just twenty-seven days after Colony received the inspection report. That amount of time is shorter than the lower end of the at least "one or two months" contemplated in Kapiloff, during which an insurer is permitted to timely process information regarding the conditions of an insured property. Nonetheless, Peterson, Evergreen, and the majority assert that such a grace period does not apply to Colony merely because Kapiloff is a Maryland case. In the absence of more on-point case law from North Carolina, however, Kapiloff provides strong and logical guidance, given its factual similarity to this case.

Kapiloff was indeed a case arising out of the District of Maryland and applying Maryland law based upon jurisdiction pursuant to 28 U.S.C. § 1332(a), but the relevant portion of the opinion is in no way Maryland-specific. In the entirety of Part V of the Kapiloff opinion, which discusses the grace period before waiver occurs, this Court cited to Maryland law in three different instances. First, this Court cited A/C Electric Co. v. Aetna Insurance Co., 247 A.2d 708, 713 (Md. Ct. App. 1968), and McFarland v. Farm Bureau Mutual Automobile Insurance Co., 93

29

A.2d 551, 554 (Md. 1953), for the proposition that "an insurance company may waive a condition of its policy by its conduct when it induces an honest belief that the condition is not required, when the insured is duly misled, and when no extension of coverage results from the waiver." Kapiloff, 155 F.3d at 497. North Carolina follows a similar scheme. See Brendle v. Shenandoah Life Ins. Co., 332 S.E.2d 515, 518 (N.C. Ct. App. 1985) ("An insurer may be found to have waived a provision or condition in an insurance policy which is for its own benefit. Implied waiver occurs when the insurer acts in a manner inconsistent with an intention to enforce strict compliance of the contested provision, and the insured is naturally led to believe that the right has been intentionally given up." (citations omitted)). Second, this Court cited Prudential Insurance Co. v. Brookman, 175 A. 838, 840 (Md. Ct. App. 1934), for the proposition that "waiver or estoppel may occur only when it does not create new coverage; an extension of coverage may only be created by a new contract." Kapiloff, 155 F.3d at 497. Again, North Carolina follows the same rule. See Gore v. Assurance Co. of Am., 704 S.E.2d 6, 10 (N.C. Ct. App. 2010) ("In North Carolina, the doctrines of waiver and estoppel are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly

30

excluded from coverage." (citation omitted) (internal quotation marks omitted)).

Finally—and most relevant here, as it immediately precedes the above block quote from Kapiloff—this Court cited Monumental Life Insurance Co. v. U.S. Fidelity & Guaranty Co., 617 A.2d 1163, 1181 (Md. Ct. Spec. App. 1993), for the proposition that "an insurance company that denies coverage or rescinds the policy in bad faith risks liability for that action." Kapiloff, 155 F.3d at 497. Once again, North Carolina adheres to a nearly identical rule. See Robinson v. N.C. Farm Bureau Ins. Co., 356 S.E.2d 392, 395 (N.C. Ct. App. 1987) (vacating summary judgment for the defendant insurer and stating, "An insurance company is expected to deal fairly and in good faith with its policyholders. . . . Th[e] evidence is sufficient to establish a tortious bad faith refusal to settle in a timely manner." (paragraph break omitted)); see also Thomas v. Ray, 317 S.E.2d 53, 57 (N.C. Ct. App. 1984) ("We are aware that insurance companies have wrongfully denied coverage in some cases in which bad faith or careless business practices might reasonably be imputed to them."). In sum, nothing about the relevant portion of our decision in Kapiloff is unique to Maryland law; quite the opposite, North Carolina has the same guidelines to resolve the same types of issues, and thus this Court should ipso facto reach the same result.

*Kapiloff*, rather than announcing a Maryland-specific rule, provides a much-needed yardstick for assessing reasonableness in a factual scenario identical to the one at play here. It is curious, given their rejection of *Kapiloff*'s at least "one or two months" time period, that Peterson and Evergreen do not advocate for any standard of their own regarding what amount of time would have been reasonable for Colony to respond; on the contrary, they simply contend that North Carolina does not have a hard-and-fast sixty-day rule. Similarly, while not disputing that reasonableness is the sine qua non of whether Colony waived the endorsement provision, the majority does not put forth any amount of time that it believes would be reasonable for Colony to process the information and send notice to Peterson and Evergreen, nor does the majority cite any authority for the idea that twenty-seven days is, as a matter of law, unreasonable and that an insurer should necessarily process information in a more timely fashion.

By casting aside the rule from *Kapiloff*—and thus ignoring one of the two criteria that we should consider when trying to predict how the North Carolina Supreme court would rule in this case—the majority appears to think that insurance companies operate drastically differently across state lines, thus ignoring the day-to-day realities of the business and the fact that North Carolina, like Maryland, also holds insurers liable

32

for wrongfully denying coverage or rescinding a policy in bad faith.  Compare Monumental Life Ins. Co., 617 A.2d at 1181, with Robinson, 356 S.E.2d at 395, and Thomas, 317 S.E.2d at 57. Given that Kapiloff is directly on point and is a published decision of this Court, and that there is not any North Carolina authority to the contrary to even suggest that twenty-seven days is an unreasonable time to respond (but there is authority to suggest that twenty-seven days is not unreasonable, see Nelson, 630 S.E.2d at 233), I would follow Kapiloff's guidance and logic in this case.  Accordingly, I do not think that Colony was required to have notified Peterson and Evergreen that the utilities were off at the time that the 501 building burned.

C.

Peterson and Evergreen also contend that Colony should not be permitted to avail itself to a grace period because, at other times, Colony acted more quickly—at times on the same day—to contact policyholders after receiving inspection reports. Specifically, Peterson and Evergreen included in their brief a table showing that Colony had, at other times, responded in a more timely fashion following receipt of an inspection report. Among these examples is an instance from 2009 in which Colony's underwriter reviewed an inspection report and took action twenty-two days after the assistant underwriter received the

33

report.  Based on Peterson and Evergreen's implication that this time period was reasonable, Peterson and Evergreen would apparently draw the reasonableness line somewhere between day twenty-two and day twenty-seven.  Perhaps at day twenty-four.  Or maybe day twenty-six, thus leaving Colony on the outside looking in by just twenty-four hours.

The problem with this approach is readily evident: if we were to use a company's own prior response times as the benchmark for what is reasonable, companies might begin dragging their feet in responding to reports to establish a record of slower response times, thus creating an environment in which prolonged delays become the new business norm—and are even encouraged—due to the fear of future litigation.  This would have the opposite effect of ensuring that insurance companies provide timely notice to policyholders of defects or breaches.

## II.

The majority did not reach the issue of whether Randolph Bank can recover from Colony because it held that Colony's purported waiver trumps any alleged knowledge of a material misrepresentation.  But because I do not think that Colony waived its rights, as explained above, I would reach the merits of Colony's defenses to Randolph Bank's counterclaims.

34

There are two possible ways for Randolph Bank to recover payments/benefits under the policy: as Peterson and Evergreen's loss payee or as mortgagee of the 501 building. As a loss payee, however, Randolph Bank stands in the same shoes as Peterson and Evergreen and its rights are coterminous with those of Peterson and Evergreen; thus any successful defense by Colony against Peterson and Evergreen also works as against Randolph Bank. See Wells Fargo Equip. & Fin., Inc. v. State Farm Fire & Cas. Co., 805 F. Supp. 2d 213, 218–19 (E.D. Va. 2011) (citing Sydincate Ins. Co. v. Bohn, 65 F. 165, 173 (8th Cir. 1894)), aff'd, 494 F. App'x 394 (4th Cir. 2012). Because Colony has a successful defense against Peterson and Evergreen pursuant to Kapiloff, Randolph Bank is precluded from recovery under the loss-payee theory.

Colony further argues that Randolph Bank cannot recover as an innocent mortgagee of the 501 building because Randolph Bank is responsible for, and/or had knowledge of, Peterson and Evergreen's noncompliance with the endorsement provision. Colony advances two theories. First, Colony claims that Clayton—whom Randolph Bank engaged to procure the policy—was Randolph Bank's agent. Colony reasons that because Clayton filled out the insurance application containing the material misrepresentations regarding the status of the utilities, those misrepresentations can be imputed to Randolph Bank and the

35

policy is void as to Randolph Bank.  See In re McCrary, 435 S.E.2d 359, 364 (N.C. Ct. App. 1993) ("Under [the relevant state statute], an insurer may avoid the policy if the insured makes a representation which is both (1) false and (2) material; the misrepresentation need not be fraudulent." (emphasis deleted)). Although sound in principle, this argument by Colony fails in light of the jury's finding that Randolph Bank was not responsible for the representations made in the application for insurance.  Insofar as Colony failed to file a Rule 50(b) motion after trial, it cannot now challenge the sufficiency of the evidence and the jury's findings; thus, the agency theory fails.

Second, Colony argues that Randolph Bank itself had actual knowledge of the misrepresentations in the application for insurance that substantially increased the risk of loss but never informed Colony of that knowledge.  The jury passed on the question of whether Randolph had actual knowledge based on its conclusion that Colony had waived and/or was estopped from rescinding the endorsement provision.  The policy states, in relevant part, as follows:

> If we [Colony] deny your [Peterson and Evergreen] claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder [Randolph Bank] will still have the right to receive loss payment if the mortgageholder: . . . (3) has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

36

Randolph Bank and Colony have a material factual dispute regarding communications between Peterson and representatives of Randolph Bank as to whether Randolph Bank had knowledge that the utilities at the 501 building were off.[3] In particular, Colony claims that Randolph Bank was told, via telephone, that the utilities were off at the 501 building; Randolph Bank, on the other hand, claims that it specifically required that a letter be sent to it confirming the state of the utilities at the 501 building and that it never received such letter. Because the jury did not reach this issue, and because this issue is determinative of whether Colony must pay benefits to Randolph Bank, I would remand the case for trial on the sole issue of whether Randolph Bank had knowledge that the utilities were off and failed to notify Colony pursuant to the policy.

III.

For the reasons set forth above, I would reverse the district court's denial of Colony's Rule 50(a) motion as to waiver of the endorsement provision and remand the case for trial as to whether Randolph Bank had knowledge that utilities

---

[3] Randolph Bank does not appear to contend that the utilities being off constitutes a "substantial change in risk" for purposes of the policy, but argues only that it did not have any such knowledge.

at the 501 building were off.  Therefore, I very respectfully

dissent.